## EX PARTE ELMER PEEDE.

No. 2949. Decided October 14, 1914.

Rehearing denied November 18, 1914.

**1.—Habeas Corpus—Delivering Intoxicating Liquor in Local Option Territory—Statutes Construed.**

Section 5 of the Act of the Thirty-third Legislature, known as the Allison Law, does not absolutely prohibit the interstate shipment and transportation of intoxicating liquors, but only such as are intended by any person interested therein to be received, possessed, sold or in any manner used in violation of any law of this State; which latter is a question of fact. Prendergast, Presiding Judge, dissenting.

**2.—Same—Interstate Shipment—Delivery by Express Agent.**

Where a resident in local option territory ordered intoxicating liquor from a neighboring State for his personal use and that of his family only, it was no violation of section 5 of the Act of the Thirty-third Legislature, known as the Allison Law, that the agent of the express company over which the liquor was shipped as an interstate shipment, delivered the same to said person in said local option territory. Prendergast, Presiding Judge, dissenting.

**3.—Same—Interstate Shipment—Statutes Construed.**

Where the prosecution was instituted upon the theory that all interstate shipments and transportation of intoxicating liquors was prohibited under the so-called Allison Liquor Law, such construction would do violence to the language used in section 5 of said act, and would make it necessary for this court to strike therefrom the words, "which such spirituous, vinous, or malted, fermented, or other intoxicating liquor is intended by any person interested therein to be received, possessed, sold, or in any manner used in violation of any law of this State." Prendergast, Presiding Judge, dissenting.

**4.—Same—Rule of Constuction—Right to Deliver.**

All the courts can do is to declare and enforce the law as written and passed by the Legislature; and under section 5 of said Allison Law, the right of a common carrier to accept for shipment and transportation for hire by interstate shipment intoxicating liquors into prohibition territory would necessarily carry with it the right to deliver the consignment to the consignee. Prendergast, Presiding Judge, dissenting.

**5.—Same—Personal Use of Liquor—Intrastate Shipment.**

There is no law of this State that makes it a criminal offense for a person to drink intoxicating liquors or to give it to members of his family, which becomes clear under section 9 of said Act, and it does not follow that because under sections 2, 3 and 4, which relate to intrastate shipments and absolutely prohibit the delivery of intoxicating liquors in prohibition territory, that such delivery can not be made by interstate shipments when intended for personal use only. Prendergast, Presiding Judge, dissenting.

**6.—Same—Statutes Construed—Legislative Power and Intent.**

Where the Legislature has provided one rule of law as it relates to interstate shipments under section 5 of said act, and another as it relates to intrastate shipments under sections 2, 3 and 4 of said Act, it is not for this court to question their wisdom in so providing; however, the question of intrastate shipments is not involved in the instant case, and is not passed upon. Prendergast, Presiding Judge, dissenting.

**7.—Same—Case Stated—Personal Use—Statutes Construed.**

Section 5 of said Act is the only one that deals with shipping liquors from without the State to a point within the State, and where the facts are undisputed that the shipment originated without the State to be carried to a point within this State, any prosecution had must be under the provisions of that section, and as this does not prohibit such shipments for personal use, no offense was committed where the agent of the carrier delivered the same to the consignee. Prendergast, Presiding Judge, dissenting.

**8.—Same—Constitutional Law—Interstate Shipments—History of Legislation.**

To aid the different States to more successfully and completely enforce their prohibitory laws, Congress finally restricted the unlimited right to import intoxicating liquors into prohibition territory, by the Webb-Kenyon law, which prohibits the interstate shipment of intoxicating liquors into prohibition territory of the different States when intended to be received or possessed to be sold or used in violation of any law of the State; to hold otherwise would render section 5 of the Allison Law violative of the Constitution of the United States, and would permit the shipment of intoxicating liquors for both legal and illegal purposes. Prendergast, Presiding Judge, dissenting.

**9.—Same—Statutes Construed—No Conflict of Law.**

It will be noticed that section 5 of the Allison Law, relating to interstate shipments of intoxicating liquors into prohibition territory, is a literal copy of the provisions of the Webb-Kenyon Act, and both are constitutional, and the language in both is plain and unambiguous.

**10.—Same—Supreme Court of United States.**

While the Webb-Kenyon Law, with reference to the interstate shipment of intoxicating liquors into prohibition territory, has not been before the Supreme Court of the United States, yet similar statutes have been passed on by that court, and their validity upheld. Following Hoke v. U. S., 227 U. S., 308, and other cases.

**11.—Same—Statutes Construed—Interstate Shipments.**

As to whether, since the passage of the Webb-Kenyon Law, the Legislature could pass a law prohibiting the interstate shipment and delivery of intoxicating liquors into a State for any and all purposes, even the individual use of the person to whom it was shipped, is not a question before this court, as section 5 of the Allison Law does not seek to do so, and only prohibits the transportation, shipment and delivery of such liquors from a point without this State to a point within this State where such liquors are intended to be received, etc., in violation of any law of this State.

**12.—Same—Statutes Construed—Ignorance of Law—Proper Care.**

If the person received the liquor to sell same in prohibition territory or use it in any manner in violation of any law of this State, the relator who delivered the liquor to such person in prohibition territory would be guilty of an offense, and a railroad or express company which transported it would be guilty of a violation of said law, and this is a question of fact, and they can not plead ignorance of the law, but must use proper care.

**13.—Same—Statutes Construed—Legislative Intent.**

Section 4 of the Allison Act has no application to interstate shipments of intoxicating liquors, and the Legislature in dealing with interstate shipments used language deliberately in accordance with the language of the Webb-Kenyon Law, and meant for section 5 of said Allison Law to apply exclusively to interstate shipments; besides, a State is powerless to prohibit interstate shipments of liquor for personal use. Following Van Winkle v. State, 91 Atl. Rep., 385. Prendergast, Presiding Judge, dissenting.

**14.—Same—Conflict Between State and Federal Laws—Police Power.**

See majority opinion, on motion for rehearing, for a discussion of the conflict between the State and Federal governments for control and regulation of the sale and transportation of intoxicating liquors, and the construction, meaning and legal effect of the interstate commerce clause, and the police power of the different States.

**15.—Same—Interstate Shipments—Statutes Construed.**

If section 4 of the Allison Law could be held to apply to shipments of liquor from one State to another State for personal use, then the opinions of every court of last resort which have been called upon to pass on that question would hold that section inoperative and void, but the Legislature did not intend that section 4 of said Allison Act should apply to interstate shipments, but that only section 5 of said Act should be applicable to such shipments, and thereby legalized and authorized such shipment for personal use. Prendergast, Presiding Judge, dissenting.

Appeal from the District Court of Kaufman. Tried below before the Hon. F. L. Hawkins.

Appeal from a habeas corpus proceeding remanding relator to custody, upon a capias based upon an affidavit charging him as agent of an express company with delivering intoxicating liquors to a person in a prohibition territory by interstate shipment.

The opinion states the case.

*S. J. Osborne* and *W. Dorsey Brown,* for relator.—On question of intra and interstate shipments of intoxicating liquors into prohibition territory: Van Winkle v. State, 91 Atl. Rep., 385; Southern Express Co. v. State, 66 Southern Rep., 115; Palmer v. Southern Express Co., 165 S. W. Rep., 236; Adams Express Co. v. Com., 169 S. W. Rep., 603; 'Adams Express Co. v. Com., 157 S. W. Rep., 908; State v. U. S. Express Co., 145 N. W. Rep., 451.

On question of construing statute: Ex parte Woods, 52 Texas Crim. Rep., 588.

On question of interstate shipments of liquor for personal use: Johnson v. S. P. Ry. Co., 196 U. S., 1; American Net and Twine Co. v. Worthington, 141 U. S., 468; Church of Holy Trinity v. U. S., 143 U. S., 457; Dunlap v. U. S., 173 U. S., 65; Downs v. Bidwell, 182 U. S., 244.

On question of exclusive power of Congress to regulate interstate commerce: Vance v. Vandercook Co., 170 U. S., 438; Heyman v. So. Ry. Co., 203 U. S., 270; Rhodes v. Iowa, 170 U. S., 412; Bowman v. Ry. Co., 125 U. S., 465.

*B. F. Looney,* Attorney General, and *W. A. Keeling* and *C. M. Cureton,*

Assistants Attorney General, for the State.—It is apparent, therefore, from whatever standpoint you may view it, that the consignee, consignor and the express company were all interested in the property and the shipment within the usual and ordinary definition of the word "interested" as well as within the legal definitions of that word. The relator of course was not interested in the shipment except as an agent of the carrier, but it is clear that all of the parties concerned were "interested" in the shipment in some degree, and certainly they were all "interested" in the sense that they all participated in the shipment, which we believe is a sufficient interest to bring them within the terms of the statute. This construction is one consistent with the accepted definitions of the word "interested," is sound in reason and clearly in aid of the evident purpose of the Act; for the Legislature undoubtedly intended to inhibit any shipment where either the consignor, consignee, the express company or its agents had a guilty intention in making or participating therein. This construction is not only sound in reason, but is supported by the very latest authority construing the Webb-Kenyon Act, of which section 5 of the Allison law is a substantial copy, and as to the use of this word "interested" is an exact copy. State v. Grier, 88 Atl. Rep., 579.

We think it conclusive, therefore, that the consignor, the express company, its agents, and the consignee were all "interested" in this shipment, and that they all "intended" that it should be transported, carried and delivered to the consignee in violation of law; therefore, the act of transporting and the delivery of the liquor by the relator was inhibited by the Allison bill unless the shipment was protected as interstate commerce. The substance of the relator's contention in this respect is that inasmuch as the shipment of liquor in question was intended by the consignee for the use only of himself and family, that the Webb-Kenyon Act does not rob it of its interstate character, and that, therefore, it was under the protection of the interstate commerce clause, and the relator could not be guilty of crime in delivering the same.

It may be conceded that intoxicating liquors up to the time of the passage of the Webb-Kenyon Act were legitimate articles of interstate commerce, and an interstate shipment thereof before actual delivery could not be made subject to the laws of this State.

The Webb-Kenyon Act in terms prohibits the shipment or transportation in interstate commerce of intoxicating liquors *intended by any person interested therein to be received, possessed, sold or in any manner used in violation of the law* of the destination State. The effect of the Act undoubtedly is to remove from liquors transported from one State to another, under the circumstances named, the protection of the interstate commerce clause of the Constitution and place such shipments in this respect exactly upon the same footing as intrastate shipments. State v. Grier, 88 Atl. Rep., 579; Adams Express Co. v. The Commonwealth of Kentucky, 157 S. W., 908.

The opinion of the Delaware court supports the several propositions we have heretofore discussed and is quoted and approved by us as de-

cisive of the questions here in issue. We believe that the construction and interpretation given the Webb-Kenyon Act would be the reasonable and proper construction and interpretation of that law, and one consistent with its primary purpose to permit the States to regulate the transportation of intoxicating liquors unembarrassed by the interstate commerce clause of the Federal Constitution. In fact, the caption of the bill itself, which may properly be looked to in determining its purpose, practically settles the question. The caption reads: "An Act divesting intoxicating liquors of their interstate character in certain cases." 11 Ency. U. S. Sup. Ct. Rep., 131; Walraven v. Bank, 96 Texas, 331; Lewis' Sutherland on Stat. Const., sec. 339, p. 650; White v. U. S., 191 U. S., 545; Wilson v. Spaulding, 19 Fed. Rep., 304; Church of Holy Trinity, 143 U. S., 457.

We conclude, therefore, that under section 4 of the Allison law a delivery of the intoxicating liquors in question by the relator to Laird, the prosecuting witness, was in violation of law and that inasmuch as the consignee, the consignor and the express company and its agents "intended" that the shipment when made should be so delivered in violation of law, and inasmuch as they each were "interested" in the shipment and its delivery as we have heretofore defined that term, then the shipment was not entitled to be protected as interstate commerce, and its shipment, transportation, carriage and delivery were all in violation of law, and the relator was properly remanded to the custody of the sheriff. In other words, it being in violation of law for anyone to transport, carry or deliver intoxicating liquor to the prosecuting witness in Kaufman County under the provisions of section 4 of the Allison law, the act of the express company in transporting the liquor for the prosecuting witness to Kaufman, in Kaufman County, was in itself unlawful, and, therefore, the delivery of the liquor by the relator to the prosecuting witness was not protected as an act of interstate commerce, and the relator is guilty of delivering the liquor in violation of section 4 of the Allison Act. Cases cited in dissenting opinion.

HARPER, JUDGE.—This case involves the proper construction of what is known as the "Allison Law," being chapter 31 of the Acts of the First Called Session of the Thirty-third Legislature. This Act became effective on the 19th day of last November, and soon thereafter this cause was instituted, and on appeal was filed in this court in December. Oral argument was heard, and thereafter time was given both the Attorney General and counsel for relator to file briefs herein, and both have filed able and exhaustive briefs, discussing in almost all its phases legislation relating to the regulation and prohibition of intoxicating liquors. That portion of the law which may be said to be involved in this decision are sections 2, 3, 4 and 5 of the Act, which read as follows:

"Sec. 2. Except as otherwise provided in this Act it shall be unlawful for any person, firm or corporation, or any officer, agent or employe

thereof in this State to deliver to any other person, firm or corporation, or any agent, officer or employe thereof, any intoxicating liquor for shipment, transportation, carriage or delivery within this State.

"Sec. 3. Except as otherwise provided in this Act, it shall be unlawful for any person, firm or corporation, or any agent, officer or employe thereof in this State to receive from any other person, firm or corporation, or any agent, officer or employe thereof, any intoxicating liquor for shipment, transportation, carriage or delivery within this State.

"Sec. 4. Except as otherwise provided in this Act, it shall be unlawful for any person, firm or corporation, or any agent, officer or employe thereof to ship, transport, carry or deliver any intoxicating liquor to any other person, firm or corporation, or any agent, officer or employe thereof in this State.

"Sec. 5. It shall be unlawful for any person, firm or corporation, or any officer, agent or employe thereof to ship or transport in any manner or by any means whatsoever any spirituous, vinous, malted, fermented or other intoxicating liquor of any kind from a point within any other State or Territory or district of the United States to any person, firm or corporation, or agent, officer or employe thereof in this State residing or living within any territory within this State where the sale of intoxicating liquors has been prohibited under the laws of this State, which such spirituous, vinous or malted, fermented or other intoxicating liquor is intended by any person interested therein to be received, possessed, sold or in any manner used in violation of any law of this State."

It will be noted that section 5 of the Act is the one that deals with the shipment of intoxicating liquors from one State to another State—what is termed interstate commerce. It will be further noted that this section does not absolutely prohibit the interstate shipment and transportation of intoxicating liquor, but only such "as are intended by any person interested therein to be received, possessed, sold or in any manner used in violation of any law of this State." Had the Legislature intended to prohibit altogether the interstate shipment of intoxicating liquors, it would have been easy to have had the Act so read. If when enacting section five (5) it had stopped when reaching the word "which" in line 8 of the Session Acts, said section would have read:

"Sec. 5. It shall be unlawful for any person, firm or corporation, or any officer, agent or employe thereof to ship or transport in any manner or by any means whatsoever any spirituous, vinous, malted, fermented or other intoxicating liquor of any kind from a point within any other State or Territory or district of the United States to any person, firm or corporation, or agent, officer, or employe thereof in this State residing or living within any territory within this State where the sale of intoxicating liquors has been prohibited under the laws of this State."

The language then would have needed no construction, for it would have, in clear and unequivocal terms, prohibited the interstate shipment and transportation of intoxicating liquors into prohibition territory. But for some reason the Legislature did not elect to so declare the law. Instead of so doing it elected to prohibit only such shipments

as were intended "to be used or possessed in violation of the laws of this State." When they added to section 5 the qualifying words "which such spirituous, vinous, or malted, fermented or other intoxicating liquor is intended by any person interested therein to be received, possessed, sold or in any manner used in violation of any law of this State," it becomes an issue of fact in each and every case of interstate shipment and transportation of intoxicating liquor whether or not such liquors were "intended by any person interested therein to be received, possessed, sold or in any manner used in violation of any law of this State."

In this case there is a statement of facts, and it may be said to conclusively show that, after the Allison law became effective, H. A. Laird, who resides in Kaufman County, Texas, ordered from Rush Distilling Company of Fort Smith, Arkansas, four quarts of whisky, sending the money therefor along with his order. When the Rush Distilling Company received the order at Fort Smith, Arkansas, it delivered to the Wells Fargo Express Company, at its office in Fort Smith, Arkansas, the four quarts of whisky to be shipped and transported to Mr. Laird at Kaufman, Texas, and said liquor was transported by the express company to Kaufman, Texas. Relator, Elmer Peede, is agent of the express company at such point, and he refused to deliver the whisky to Mr. Laird unless Mr. Laird would make an affidavit that such liquor was not intended to be received, possessed, sold or in any manner used in violation of any law of this State, Kaufman, Texas, being situate in prohibition territory. Mr. Laird made this affidavit before Will A. Hindman, a notary public, and delivered it to the express agent, relator Peede, who then delivered to him the liquor. For making such delivery he is being prosecuted in this case.

The affidavit made by Mr. Laird and delivered to the express agent reads:

"Before the undersigned authority, a notary public in and for Kaufman County, Texas, on this day personally appeared H. A. Laird, known to me to be a credible citizen of Kaufman County, Texas, and over the age of 21 years, and after being by me duly sworn on his oath deposes and says: That he is the consignee of a certain package of whisky shipped from Fort Smith, Arkansas, that the consignor of said package is the Rush Distilling Company and that said package of whisky was ordered by affiant for his own personal use, and that of his family only, that said package of whisky was shipped to affiant from Fort Smith, Arkansas, since Dec. 1st, 1913, and was duly received by the Wells Fargo & Co. Express at Kaufman, Texas, and that said whisky is intended by me to be used by me for my own personal use and the use of my family only, and that no other person than this affiant is interested in such shipment, and said whisky was not ordered, shipped, received or possessed by me or delivered to me for the purposes of sale, or in any manner to be used by me for any other purpose or in violation of any law of the State of Texas, or of any law of the United States."

Mr. Terry, the county attorney of Kaufman County, testified: "This

prosecution was not instituted upon the theory that the liquor delivered to Laird was ordered, possessed, or delivered for any unlawful purpose; this prosecution was instituted upon the theory that any delivery of intoxicating liquors in a local option county under an interstate shipment is unlawful; there was no evidence upon the examining trial whatever, or suspicion that the liquor was intended to be used for any unlawful purpose and I know of no such evidence now."

It is thus seen that no contention was made that the whisky shipped, transported and delivered to Mr. Laird was intended to be received, possessed, sold or in any manner used in violation of the law, but it is frankly admitted and proven that such was not the case, and this prosecution was instituted upon the theory that *all interstate shipment and transportation of intoxicating liquors* was prohibited by the above quoted Act. Such construction would do violence to the language used in section 5 of the Act relating to the interstate shipment of intoxicating liquors, and would make it necessary for the court to strike from said section the words, "which such spirituous, vinous or malted, fermented or other intoxicating liquor is intended by any person interested therein to be received, possessed, sold or in any manner used in violation of any law of this State," and this the court is not authorized to do. It is immaterial whether, in the wisdom of the court, it would be best that such words had been omitted from the law. The court is not the law enacting agency of the government—that function is conferred upon the Legislature, and all the courts can do is to declare and enforce the law as written and passed by the legislative branch of the government. It is not for us to question or conjecture why the Legislature so provided in that section dealing with the interstate shipment of intoxicating liquors. It may be they questioned their authority to prohibit all interstate shipments of intoxicating liquors, or it may be they thought it not wise to do so, but whatever may have been their reason, the law as written by them must govern, and they have in unquestionable terms provided that in so far as interstate shipments of intoxicating liquors (at least) are concerned that the shipment and transportation into prohibition territory is only prohibited when intended to be received, possessed, sold or in some manner used in violation of the laws of this State. And the right of a common carrier to accept for shipment and transport for hire, would necessarily carry with it the right to deliver the consignment to the consignee.

In the statement of facts it is conceded that the liquor was intended only for the personal use of Mr. Laird and members of his family, and the county attorney says, "there was no evidence or suspicion that the liquor was intended for any unlawful purpose." There is no law of this State that makes it a criminal offense for a person to drink intoxicating liquors or to give it to members of his family. In fact, section 9 of the Act specifically recognizes a man's right, and makes it legal for one to have intoxicating liquor in his possession for his own use and the use of members of his family. That section reads:

"Sec. 9. Nothing in this Act shall make it unlawful for any person

for the use of himself or the members of his family residing with him, to personally carry such liquor to any point within this State."

Thus it is made clear that it is not unlawful for a man to possess liquor in prohibition territory, and the use of it by himself and the use of it by members of the family of a person having it in his possession in prohibition territory is not unlawful, for the statute so declares.

But it is contended that sections 2, 3 and 4, which relate to intrastate shipments, or shipments from one point in this State to another point in the State, absolutely prohibit the transportation, shipment and delivery of intoxicating liquors, and that such sections do not contain the qualifying clause in section 5, "which such spirituous, vinous or malted, fermented or other intoxicating liquor is intended by any person interested therein to be received, possessed, sold or in any manner used in violation of any law of this State," and therefore it was intended to render unlawful all shipments, transportation and delivery of intoxicating liquors in prohibition territory. However, those making such contention must have overlooked the qualifying clause in sections 2, 3 and 4, which reads: "Except as otherwise provided in this Act," for in section 5, when dealing with interstate shipments, the law "otherwise provides," for it then recites that it only shall be unlawful to "ship and transport from a point without the State to a point within the State when such liquors are intended by some person interested therein to be. received, possessed, sold or in some manner used in violation of any law of this State," and the provisions of sections 2, 3 and 4 can not be made to annul and render void the language of section 5, which is the only section of the law that relates to interstate shipments, and if the Legislature has provided one rule of law as it relates to *interstate* shipments, and another as it relates to *intrastate* shipments, if they have done so, it is not for us to question their wisdom in so providing. However, the question of *intrastate shipments* is not involved in this case, and we do not wish to be understood as expressing any opinion as to whether or not by the terms of the Allison law such shipments are prohibited when intended for one's own use, from one point in this State to another point in this State. That question will be decided when it properly arises in a case before the court. What we do hold, that section 5, which is the only section that deals with shipping liquors from without the State to a point within the State, is the section that must govern in this case, for it is an undisputed fact that the shipment originated in Arkansas, to be carried to a point in Texas, and any prosecution had must be under the provisions of that section, and as it only prohibits shipments when intended to be sold or used in violation of a law of this State, the facts in this case show no offense to have been committed, for as before stated as the carrier was authorized under this section to accept the shipment and transport it, it certainly had a right to make a delivery of the shipment to the consignee, for under all the authorities the transportation is not complete until delivery is · made to the consignee.

Having this view of the law, renders it wholly unnecessary to discuss

the various constitutional questions raised in the briefs on file, and we would not do so, only our associates on the bench, taking a somewhat different view as to the effect of the testimony and law in the various and numerous consultations we have had over this case since it has been submitted to us for consideration, perhaps renders it necessary to express our views, as they may do so in the opinions they are preparing. Under such circumstances we do not think it improper to briefly review the history of legislation relating to the prohibition of the manufacture and sale of intoxicating liquors. When some of the States first adopted laws absolutely prohibiting the manufacture and sale of intoxicating liquors, their constitutionality was vigorously assailed in the Supreme Court of the United States, but that the State possessed such power and that such a law was valid was forever settled in the case of Mugler v. Kansas, 123 U. S., 623, where there is a learned and able discussion of the question. This decision has been reaffirmed by the Supreme Court of the United States in all later cases, and has been followed by the Supreme Court of every State where the question has been raised. However, the Supreme Court of the United States, in the case of Bowman v. Chicago & Northwestern Ry. Co., 125 U. S., 465, and Leisy v. Hardin, 135 U. S., 100, did very much to render ineffectual the State prohibitory laws, for it was held in those cases that any person had the right to import intoxicating liquors in unlimited quantities, and sell such liquors in the original packages, even though a State had prohibited its manufacture and sale within its borders—the holding being that intoxicating liquors were articles of commerce, and Congress had control over interstate commerce, and any state law which had for its purpose the prohibition of the importation of intoxicating liquors from other States, or to prohibit the sale in the original package, was void as a restraint upon interstate commerce. After the decisions in those two cases, authorizing the sale of whisky in original packages in prohibition territory, Congress felt called upon to remedy that evil, and protect the States in their right to prohibit the sale of intoxicants within their own States and passed in August, 1890, what is known as the "Wilson bill." That Act reads: "That all fermented, distilled or other intoxicating liquors or liquids transported into any State or Territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

In the case of In re Rahrer, 140 U. S., 545, the Supreme Court of the United States held that under this Act liquors imported from one State into another State could not be sold in prohibition territory in the original package or otherwise, and that the State laws prohibiting the sale of intoxicating liquors would also prohibit the sale of imported liquors in the original package, and since that decision no liquor can

be sold in prohibition territory in original packages or otherwise. But in construing the Wilson law, the court held that the interstate commerce clause of the Federal Constitution protected interstate shipments of intoxicating liquors until its delivery to the consignee, and that all the Wilson law did was to authorize a State to prohibit its sale in the original package by the consignee after its delivery to him.

And in further construing the above Act of Congress the Supreme Court of the United States in Vance v. Vandercook Co., 170 U. S., 438, held that while under the Wilson Act the States could prohibit the sales of liquor imported from one State to another, yet a State had no authority to prohibit the *importation* of liquor from one State into another State. The court held: "The Act of Congress of August 8, 1890, subjects the sale of original packages of intoxicating liquors to State laws which restrict or regulate such sales, as well as to laws which forbid them. But the right of persons in one State to ship liquor into another State to a resident for his own use is derived from the Constitution of the United States and does not rest on the grant of the State law." And in Rhodes v. Iowa, 170 U. S., 412, the court held: "That the States' power under the Wilson law to forbid the sale of intoxicating liquors does not carry with it the power to prevent its importation." Under these two decisions, and others that might be quoted, the right to import liquors from another State into prohibition territory in any quantity and under any circumstances has been upheld, thus allowing the bootlegger and other violators of the law to obtain intoxicating liquors in unlimited quantities. Having this right under the Federal Constitution and laws (which are supreme) the enforcement of the State prohibitory laws was rendered difficult, for being allowed to import liquors in unlimited quantities for any and all purposes, sales would be made in violation of law, and other unlawful uses made thereof, and in order to aid the States to more successfully and completely enforce their prohibitory laws Congress felt called upon again to act, and to restrict and restrain this unlimited right to import intoxicating liquors into prohibition territory, resulting in the passage of what is known as the Webb-Kenyon bill. This bill reads:

"An Act divesting intoxicating liquors of their interstate character in certain cases," and provides: "That the shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one State, Territory or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof, into any other State, Territory or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof, or from any foreign country into any State, Territory or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof, which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in vio-

lation of any law of such State, Territory or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof, is hereby prohibited."

It is thus seen that Congress, although it had the right to do so, does not prohibit, nor authorize the States to prohibit, interstate shipments of intoxicating liquor, but only prohibits the interstate shipment when intended to be received or possessed to be sold or used in violation of a law of the State. It removed the protecting arm of the interstate commerce clause of the Federal Constitution thus far and no further, and to hold otherwise, in our opinion, would render, under the decisions of the Supreme Court of the United States, section 5 of the Allison law violative of the interstate commerce clause of the Constitution of the United States, and open wide the door to the interstate shipment of intoxicating liquors for both legal and illegal purposes. Congress closed and authorized the State to close the door to interstate shipments when such liquors are intended for sale in violation of the law of the State, or to be in any manner used in violation of a law of the State. Thus far Congress saw proper to go and no further. This is made manifest by the remarks of Mr. Webb, the author of the bill, when it was pending in Congress. While considering the bill the following colloquy took place:

"Mr. Carlin. The purpose of this bill is not to interfere with shipments, but simply to prohibit the shipment of liquor for sale where such sale would be illegal?

"Mr. Webb. Yes, sir; that is the object. The bill has been criticised by some of our temperance friends because it does not undertake to prohibit the whisky for individual use. As long as our Supreme Court holds that liquor is a legitimate subject of commerce, and as long as men have an appetite for liquor, and as long as the State does not prohibit the drinking of whisky, I do not think a law will be passed prohibiting the shipment of whisky for a man's personal use."

If the language of the bill was obscure or ambiguous this would be material in construing it. But the language is plain and unambiguous, and that the author used the language he did intentionally and he had not sought, and did not intend to prohibit interstate shipment of intoxicating liquors when intended for one's own use, but only when intended to be sold or used in violation of the law in prohibition territory is manifest.

It will be noticed that section 5 of the Allison law relating to interstate shipments is a literal copy of the provisions of the Webb-Kenyon Act. So if the Webb-Kenyon law is violative of no provision of the Constitution, then certainly that section of the Allison law is valid. But the constitutionality of the Webb-Kenyon Act is assailed. This Act has not been before the Supreme Court of the United States in so far as we have been able to ascertain, but it has been before the courts of last resort in a number of the States, and wherever the question has been passed on the validity of the law has been sustained, and to our mind, there is no question as to its validity. (Southern Express Co. v.

State, 66 So. Rep. (Ala.), 115; American Express Co. v. Beer, 65 So. Rep. (Miss.), 575; State v. United States Express Co., 145 N. W. Rep. (Iowa), 451; Palmer v. So. Express Co., 165 S. W. Rep. (Tenn.), 236; State v. Grier, 88 Atl. (Del.), 579; Adams Express Co. v. Commonwealth, 157 S. W. Rep. (Ky.), 908; Atkinson v. So. Express Co., 78 S. E. Rep. (S. C.), 516; State v. Cardwell, 81 S. E. Rep. (N. C.), 628; State v. Doe, 139 Pac. Rep. (Kan.), 1169.)

While this identical law has not been before the Supreme Court of the United States, yet similar statutes have been passed on by that court and their validity upheld. In the case of Hoke v. United States, 227 U. S., 308, it was held that Congress, in the exercise of its power to regulate commerce, could prohibit the transportation of women from one State to another State for immoral purposes. In the case of Champion v. Ames, 188 U. S., 321, it was held that the shipment and transportation of lottery tickets from one State to another State by an express company may be prohibited by Congress under its power to regulate interstate commerce. In that case it is said: "That regulation may sometimes appropriately assume the form of prohibition is also illustrated by the case of diseased cattle, transported from one State to another. Such cattle may have, notwithstanding their condition, a value in money for some purposes, and yet it can not be doubted that Congress, under its power to regulate commerce, may either provide for their being inspected before transportation begins, or, in its discretion, may prohibit their being transported from one State to another. Indeed, by the Act of May 29, 1884, chapter 60 (23 Stat. at L., 32), sec. 6, U. S. Comp. Stat., 1901, p. 3184, Congress has so provided." By this Act all cattle are not prohibited from being shipped from one State to another, but only certain diseased cattle, and some agency of government must be given the authority under the law to determine what cattle are so diseased. So by the Webb-Kenyon Act the shipment of all intoxicating liquors from one State to another is not prohibited, but only such liquors as are intended to be received, possessed, sold or in some manner used in violation of the law of a State.

Again Congress has prohibited by law the carrying of obscene literature and articles designed for immoral use from one State to another. (29 Stat. at L., 512; chap. 17, U. S. Comp. Stat., 1901, p. 3180.) This law was upheld in United States v. Popper, 98 Fed., 423. And if Congress can prohibit the transportation of women from one State to another for an immoral purpose, and can prohibit the shipment and transportation of obscene literature, etc., by what rule of law can it be denied the right to prohibit the shipment and transportation of intoxicating liquors from one State to another State when intended to be received, possessed, sold or used in violation of law, or sold contrary to the law of the State? We are of the opinion, as hereinbefore stated, that neither the Webb-Kenyon law nor section 5 of the Allison law (under which this prosecution must be maintained under the facts, if maintained at all) is violative of any provision of the Constitution of this State or the United States, and are valid laws.

As to whether or not, since the passage of the Webb-Kenyon law, the Legislature could pass a law prohibiting the interstate shipment and delivery of intoxicating liquors into a State for any and all purposes, even the individual use of the person to whom it was shipped, is not now before us, and it is not now necessary to discuss that question, for the State law (sec. 5 of the Allison bill) in so far as it relates to interstate shipments, does not seek to do so; it only prohibits the transportation, shipment and delivery of intoxicating liquors from a point without this State to a point within this State when such liquors are intended to be received, possessed, sold or used in violation of a law of this State, according to its plain language, and we hold that since the passage of the Webb-Canyon law a State may prohibit the transportation and shipment of liquors into prohibition territory within the State when intended to be received, possessed, sold or used in violation of any law of the State. Intoxicating liquors can not be shipped to be delivered to minors, for the laws of this State make it an offense to deliver intoxicating liquors to minors; it can not be shipped to be stored for others, for the law makes that an offense; it can not be shipped to be sold to any person in prohibition territory, for that is a violation of a law of the State, and in no instance can it be shipped into prohibition territory for any purpose declared unlawful by the laws of this State; but the Legislature has not yet declared the personal use of intoxicating liquors to be an offense in this State and this liquor, it is conceded, was only intended for the personal use of the consignee, Mr. Laird. On the other hand it has, in section 9 of the Allison law, declared the personal use of intoxicating liquors to be legal and lawful, and one is authorized to have and keep it in prohibition territory for the use of himself and members of his family.

As said by all the authorities, intoxicating liquors are peculiarly within the control of the police power of the State, and as to how far a State may or shall go in prohibiting its use is one within the wisdom and discretion of the legislative body of the State, unless inhibited by the Constitution. Regardless of the individual views of any member of the court, it is not their province to declare what the law should be, but we can only enforce the law as it is. 'If further restrictions are to be or should be placed around the interstate shipment of intoxicating liquors, this is a matter vested solely in the legislative branch of the government, and we can not engraft upon the plain letter of the law as written and enacted by the Legislature and Congress other provisions no matter how desirable we might deem them.

As it is admitted in the statement of facts on file in this case that this is a shipment from a point without the State to a point within the State, and that there is no evidence tending to show that Mr. Laird intended to receive, possess, sell or in any manner use this liquor in violation of any law of this State, we are of the opinion that relator Peede, as agent of the express company, violated no law in delivering the liquor shipped to Laird for his personal use from Fort Smith, Arkansas, and he is entitled to be discharged, and it is so ordered.

If the evidence had shown that Mr. Laird had received the liquor to sell same in prohibition territory, or use it in any manner in violation of any law of this State, relator would be guilty of an offense, for we are of the opinion that under such circumstances the agent who received it, the railroad or express company that transported it, and the agent who delivered it to the consignee, would each and every one violate the law and be subject to prosecution, and they and each of them should ascertain before accepting intoxicating liquors for interstate shipment, before transporting it, and before delivering it to the consignee, that such consignee did not intend to receive it to sell nor use in any manner in violation of any law of Texas, for if they do not adopt such rules and regulations as will enable them to ascertain such facts before receiving, shipping, transporting and delivering the same, the fact that they did not know it was to be sold or used in violation of law will not excuse them. It is only a mistake of fact that will excuse one that does not arise from a want of proper care, and the words "proper care" have been defined to be the use of all such diligence as the circumstances require and will admit of, and if a shipment is accepted, transported and delivered, and it should develop that the consignee had sold or intended to sell, or make any use of it that violated a law of this State, the fact such fact was not known at the time it was received, transported and delivered would be no defense, unless due diligence had been used prior to its acceptance for shipment, its transportation and delivery to ascertain that fact.

As hereinbefore stated, the writer had not thought a discussion of the constitutional questions called for in this case, as the facts did not show that relator had violated the law, but in deference to the views of the other members of the court we have done so to a limited extent.

The cause is reversed and the relator is discharged.

*Relator discharged.*

PRENDERGAST, PRESIDING JUDGE, dissenting.

DAVIDSON, JUDGE (concurring).—Judge Harper disposes of this case under section 5 of the Allison bill, which makes it unlawful for any person, firm, corporation, etc., to ship intoxicating liquors of any kind from without this State into this State where the sale of intoxicating liquors has been prohibited under the laws of this State, where such intoxicating liquors are "intended by any person interested therein to be received, possessed, sold or in any manner used in violation of any law of this State." The Webb-Kenyon Act is substantially the same. It prohibits the shipment of intoxicating liquors when the same are "intended to be received, possessed, sold or in any manner used either in original package or otherwise in violation of any law of this State." Judge Harper holds under the Webb-Kenyon Act that an interstate shipment of intoxicating liquors may be had from outside to the inside of Texas, provided it was not intended to be received, possessed, etc., for the purpose of violating the Texas laws. For the

sake of what I shall have to say here, without touching constitutional questions, I am concurring with Judge Harper. Under Presiding Judge Prendergast's views, it would be a violation of the Texas law to ship intoxicating liquors into prohibited Texas territory, and a violation of the law for the common carrier to deliver it to the consignee. An inspection of the Webb-Kenyon Act, I think, makes it clear, first, that it is an interstate shipment; second, that that interstate shipment is not prohibited except for unlawful purposes; third, that interstate shipments, by the terms of that law, mean that same shall be delivered to the consignee at the point of destination. If the intoxicants were intended to be used in violation of the laws of the State, that would be another question, and if the Webb-Kenyon Act, in this respect, is constitutional, then the delivery of the intoxicants for illegal purposes might form the basis of a prosecution, but in this case that is an impossibility. It is conceded by the State that the intoxicants were shipped from Fort Smith, Arkansas, to H. A. Laird in Kaufman County, for his own use, and for no other purpose. The Webb-Kenyon Act, in my opinion, does not prohibit such shipments, and not only that but it authorizes this character of shipments, and only prohibits shipments when same are for unlawful purposes. It is not unlawful, nor is it illegal for a man to have whisky for his own use in local option territory. If Presiding Judge Prendergast is right, the shipment into the State by the common carrier would be illegal and the delivery wrong. If he is right the interstate shipment would stop at the State line, and if the consignee desires his intoxicants he would have to go to the State line and receive it. I do not believe that the Webb-Kenyon Act is susceptible of such construction, nor did Congress intend any such construction, nor was any such purpose included within the terms of that Act. If the shipment stopped at the State line, it would not be an interstate shipment at all. Such construction destroys the Webb-Kenyon Act under all the authorities. By the terms of the Federal Constitution interstate commerce means shipment from point of shipment in one State to place of consignment in another State. To say that the interstate shipment would stop at the State line, would destroy the very purpose of the interstate shipment. This would destroy the Webb-Kenyon Act, and under the construction placed upon the two Acts by our Presiding Judge it might be the result that the Allison bill in toto would be unconstitutional. The object and purpose of the Allison bill, under Presiding Judge Prendergast's views, was to prevent absolutely the shipment—State and interstate—for any purpose, even for personal use, of intoxicants to such territory. The Webb-Kenyon Act authorizes the shipment for personal use, or for any purpose provided the purposes be not illegal. Presiding Judge Prendergast's views would so intermingle the two Acts that if the Webb-Kenyon bill was held unconstitutional, then by the reasoning in the cases of Pullman Car Co., 64 Texas, 274, and Ex parte Wood in 52 Texas Crim. Rep., 575, the Allison Act might be wholly unconstitutional.

It is clear under the interstate commerce clause of the Federal Con-

stitution and by the terms of the Webb-Kenyon Act, a party has the right to ship intoxicants from one State to the other. Whether it was for an unlawful purpose or not would be a question of fact. The law does not make it, as my brother Prendergast contends, unlawful per se to ship it. If he is correct, then the Webb-Kenyon congressional Act would fail, because the shipment would cease at the State line. Shipping to a State line would not be interstate shipment and could not be. These questions are not novel, but have been decided frequently. Under the Wilson Act of Congress, 1890, the question arose upon a construction of what the words "upon arrival in such State" meant. This was construed in Rhodes v. Iowa, 170 U. S., 412. It was there held that the statute did not cause intoxicating liquors transported into a State to be subject to the police power of a State upon their arrival at the State line, or while in transit in the course of interstate transportation, but only after the consummation of the shipment; and that moving intoxicating liquors from the station platform to the warehouse or railroad depot on their arrival at their destination was part of the interstate commerce transportation when they were shipped from another State, and was not a violation of the State law making transportation of such liquors from one place to another an offense. In State v. Intoxicating Liquors, 94 Me., 335, a seizure of intoxicating liquors shipped from another State by virtue of the prohibition laws of Maine was held to be premature and unauthorized where they were taken from a car standing on a siding in another city than the place of their destination, upon the ground that the interstate commerce transaction had not ceased. In Fuqua et al. v. Pabst Brewing Co., 90 Texas, 298, it was intimated that liquor shipped from one State to another became subject to the operation of the State police laws immediately upon its arrival in the State, and it was held by the United States Supreme Court in Rhodes v. Iowa, supra, that if by that it was meant that the interstate shipment terminated upon crossing the State line, it was not correct. Considerable confusion seems to have arisen in regard to this matter, and further interpretation of the Federal statute became necessary, because the courts of some of the States held that liquor shipped from other States was subject to police power of the State after arrival at their destination and while in the office of the express company that had carried them there. It was held in American Express Co. v. Iowa, 196 U. S., 133, that intoxicating liquors shipped C. O. D. from one State into another could not be subject to seizure under the laws of the State to which they were shipped while in the hands of the express company, without infringing the commerce clause of the Constitution. That case overruled 118 Iowa, 447. Heyman v. Southern Ry. Co., 203 U. S., 270, reversed 122 Ga., 608, and 118 Ga., 618, the Supreme Court of the United States holding that delivery of interstate shipments of intoxicating liquors to the consignee was essential to constitute their arrival in the State, within the meaning of the Act of August 8, 1890, and that the mere placing of such shipment in the carrier's warehouse to await delivery to the consignee did not constitute their arrival in the

State within the meaning of that Act. That that means actual delivery to the consignee and not merely implied delivery seems to be the correct inference to draw from the decisions rendered in Adams Express Co. v. Kentucky, 206 U. S., 129; also American Express Company v. Kentucky, 206 U. S., 139. Those two cases reversed several Kentucky cases which held the contrary. The Supreme Court of the United States, overruling the Kentucky cases, held that the agreement of the local agent of the express company to hold for a few days the C. O. D. shipment of intoxicating liquors to suit the convenience of the consignee in paying for such liquor and taking it away, did not destroy the character of the transaction as interstate commerce. So upon these principles a seizure of liquor was held in State v. Intoxicating Liquors, 101 Me., 430, to be an interruption of interstate shipment, and, therefore, premature and unauthorized where it appeared that the package was seized at the office of the carrier and express company in such city, upon the ground that the transportation of the liquor from the office of the express company to the designated street and number was a part of the continuance of the interstate shipment, and that the package was, therefore, protected from the operation of the laws of Maine until the act of transportation was consummated by the delivery of the consignment to its ultimate place of destination.

Under these decisions of the Supreme Court it is clear that an interstate shipment governs the entire matter from the place of shipment to the place of consignment and delivery to the consignee, otherwise it could not be an interstate shipment. It would then become a question of fact as to whether the shipment was or was not for unlawful purposes, if the Webb-Kenyon Act is given full force and effect, for that Act authorizes interstate shipments, and only limits it by a prohibition of shipment for unlawful purposes. The State law only prohibits shipments by common carrier within the State. The State law could not, of course, affect interstate commerce law. It is unnecessary here to discuss the force and effect of the Allison bill with reference to interdicting shipments through common carriers from one point to another in this State. It is not in the case. That would be an intrastate shipment while this is an interstate shipment.

The Federal Congress is supreme, and to my mind, from a reading of the Webb-Kenyon Act, it was not intended to interdict shipments generally, but only where the shipment was for unlawful purposes. The Texas Legislature can not interrupt or interfere with interstate shipments, nor can it stop the interstate shipment at the State line.

As I have before stated, I am not here passing on the constitutionality of either the Webb-Kenyon law or the Allison bill, as it is never necessary to pass on the constitutionality of a law unless the facts in the case bring it within the inhibition of the law.

These are some of the reasons why I am concurring with Judge Harper discharging relator from custody.

PRENDERGAST, PRESIDING JUDGE (dissenting).—In this opinion, among other things, I hold:

1. The Legislature unquestionably has the power and authority, not only to *prohibit* the sale of intoxicating liquor in the dry territory of this State, but also to *regulate* how it can lawfully be gotten therein, when it deems it proper or necessary to be gotten therein for any purpose whatsoever.

2. In order to *regulate* how it can lawfully be gotten into such territory, it is neither necessary nor proper that its importation and *delivery* therein should be altogether and absolutely prohibited, for if thus *prohibited* there would be, and could be, *nothing to regulate.*

3. The Allison liquor law is constitutional and valid.

4. Section 4 thereof, without doubt, makes it an offense for any person to *deliver* such liquor to any other person in such territory, wherever obtained—whether in this or some other State.

5. The Webb-Kenyon Act of the Congress is constitutional.

6. That Act prohibits the shipment of liquor from one State into another, and thereby withdraws all protection of it as interstate commerce, whenever it is intended, by any person interested therein, to be received, possessed or in any manner used, in violation of the law of such other State.

7. No one can lawfully *receive* from another that which is made unlawful and an offense for the other to *deliver* to him.

8. The law of this State prohibiting and making it an offense for anyone to *deliver* liquor to another in dry territory, it is clearly "in violation of the law" of this State for anyone to *deliver* it to another therein; it is therefore also clearly "in violation of the law" of this State for anyone to *receive* it from any other therein.

9. It was perfectly competent for the Legislature to permit any person "for the use of himself or the members of his family residing with him, to *personally carry* such liquor" into dry territory—wherever obtained, whether in this or some other State. Neither this court nor any other, has power or authority to legally say it was not so competent nor to substitute its judgment for that of the Legislature.

10. Because the law authorizes anyone for said purposes to *"personally carry"* liquor therein, by no possible construction can it be held that every person could therefore have it shipped and *delivered* to him by any and every other person.

11. Section 9, permitting one, for said purpose, to get and *personally carry* liquor into such territory, in no way affects section 4, which prohibits and makes it an offense for any other to *deliver* it to him therein.

12. This court has no right or authority to repeal, annul or strike from the statute book any valid law. The Legislature alone can lawfully do that. I am well aware that usually little attention is given to dissenting opinions and that but few, outside of the parties immediately interested, ordinarily read them, yet the questions arising and which should be decided, in this case, in my opinion, are so vital and important to the whole State, and my earnest conviction, after the most thorough

investigation and study, that they are not met, nor decided correctly by either Judges Harper or Davidson, impels me, as I see my duty, to write and file this opinion. I deplore its unusual length, but I feel I could not do justice to the cause, nor to myself, without discussing the questions and authorities fully. I first state the case and facts.

By proper and regular proceedings Peede, relator, was prosecuted, arrested and held by the sheriff of Kaufman County for unlawfully *delivering*—not *shipping* or *transporting*—intoxicating liquor,—four quarts of whisky,—to H. A. Laird in said county, under section 4 of the Act of August 21, 1913, page 62, commonly called the Allison liquor law, not under section 5 thereof. The complaint under which he was arrested and is held, charges that he "did unlawfully *deliver* to Laird said liquor"—not that he did *ship,* nor that he did *transport* said liquor. He sued out before the district judge a writ of habeas corpus. Thereunder a hearing was had and the district judge remanded him to the custody of the sheriff from which he appealed to this court.

The record establishes these facts: In the latter part of November, 1913, Laird ordered for his own use and that of his family residing with him from the Rush Distilling Company of Fort Smith, Arkansas, four quarts of whisky, and at the time sent $2 and paid therefor. No other, he claimed, was interested therein. Peede was the local agent and employe of the Wells Fargo Express Company at Kaufman in said county. Said express company was then, thereafter, and a long time prior thereto had been, engaged as an express company, a common carrier, in interstate and intrastate express business. Its business was on the line of railroads from Fort Smith, Arkansas, in the State of Arkansas, to Kaufman, Kaufman County, in Texas, as well as on other railroads. Upon receiving said order and payment therefor said distilling company shipped over and by said express company from Fort Smith, Arkansas, to Kaufman, Texas, the said liquor to Laird. Peede knew nothing about, and had no notice, that said Laird had ordered, paid for and had had shipped to him the said liquor until it was received by Peede as the agent of said express company at Kaufman, and he had no interest therein other or further than as his agency or employment for said express company; but he and his company both had that interest therein. Upon its arrival at Kaufman, and the knowledge thereof by Laird, Laird applied to Peede and demanded the *delivery* thereof to him by Peede. Peede declined to deliver it, unless and until Laird made affidavit to the effect that said whisky was not intended to be used or sold in violation of any law of Texas, and that it was ordered for his own personal use and that of his family only, and that no other person was interested therein. Upon Laird making this affidavit, Peede *delivered* said whisky to him in Kaufman, Texas. The prohibition law of this State was by the proper election, orders, etc., duly put in force in Kaufman County, Texas, in 1903, and has been in force in that county continuously since then.

"There can be no doubt that the *regulation* of the manufacture, sale, and use of intoxicating liquors has always been recognized as a subject

peculiarly appertaining to the police power of the several States respectively." License Cases, 46 U. S., 5, How., 504 (12:256); Bartemeyer v. Iowa, 85 U. S., 18, Wall., 129 (21:929); Boston Beer Co. v. Massachusetts, 97 U. S., 25 (24:989); Foster v. Kansas (Johnson), 112 U. S., 201 (28:629); Mugler v. Kansas, 123 U. S., 623 (31:205); Kidd v. Pearson, 128 U. S., 1 (32:346, 2 Inters. Com. Rep., 232); Eilenbecker v. Plymouth County Dist. Ct., 134 U. S., 31 (33:801)." All other authorities also so hold.

"The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is then liberty regulated by law. The right to acquire, enjoy and dispose of property is declared in the Constitutions of the several States to be one of the inalienable rights of man. But this declaration is not held to preclude the Legislature of any State from passing laws respecting the acquisition, enjoyment and disposition of property. What contracts respecting its acquisition and disposition shall be valid and what void or voidable; when they shall be in writing and when they may be made orally, and by what instruments it may be conveyed or mortgaged,—are subjects of constant legislation." Crowley v. Christensen, 137 U. S., 86.

In the same case (Crowley v. Christensen) the United States Supreme Court also said: "It is urged that, as the liquors are used as a beverage, and the injury following them, if taken in excess, is voluntarily inflicted and is confined to the party offending, their sales should be without restrictions, the contention being that what a man shall drink, equally with what he shall eat, is not properly matter for legislation.

"There is in this position an assumption of a fact which does not exist, that when the liquors are taken in excess, the injuries are confined to the party offending. The injury, it is true, first falls upon him in his health, which the habit undermines; in his morals, which it weakens; and in the self-abasement which it creates. But, as it leads to neglect of business and waste of property, and general demoralization, it affects those who are immediately connected with and dependent upon him."

In the same case the United States Supreme Court further said: "By the general concurrence of opinion of every civilized and Christian community there are few sources of crime and misery to society equal to the dram shop, where intoxicating liquors, in small quantities, to be drunk at the time, are sold indiscriminately to all parties applying. The statistics of every State show a greater amount of crime and misery attributable to the use of ardent spirits obtained at these retail liquor saloons than to any other source. The sale of such liquors in this way has, therefore, been, at all times, by the courts of every State, considered as the proper subject of legislative regulation. Not only may a

license be exacted from the keeper of the saloon before a glass of his liquors can be thus disposed of, but restrictions may be imposed as to the class of persons to whom they may be sold and the hours of the day, and the days of the week, on which the saloons may be opened. Their sale in that form may be absolutely prohibited. It is a question of public expediency and public morality, and not of Federal law. *The police power of the State is fully competent to regulate the business— to mitigate its evils, or to suppress it entirely."* (Italics added.)

What is held to be true by the United States Supreme Court, above quoted, has been held in substance and effect to be true, practically by the decisions of every appellate court of every State in the United States, and, by every text-book writer on the subject. Every Legislature of every State in the United States has acted thereon, as shown by the legislation thereof. It has been so recognized and acted upon by the courts of this State since its organization and by the legislation of the State all the time since its organization down to the present time.

Prior to 1876, the Legislature of this State had enacted and enforced many laws regulating, restricting, and in some instances, prohibiting the sale of intoxicating liquors as a beverage. This had been done both by various general as well as by many special laws. The Constitution of 1876 of this State (sec. 20, art. 16) commanded the Legislature at its first session to enact a law whereby the qualified voters of any county, justice precinct, town or city, by a majority vote, from time to time might determine whether the sale of intoxicating liquors "shall be prohibited" within the prescribed limits. The Legislature at once complied with this mandate of the Constitution and passed said law and, as it was its duty, prohibited such sale where the counties or the subdivisions of any had legally voted, or should thereafter vote, that the sale should be prohibited therein. By that first Act it made such illegal sale a minor misdemeanor, punishable only by a small fine. Immediately after said constitutional provision went into effect, and the first law providing for such election was enacted by the Legislature, various counties and subdivisions of many others, held elections and determined thereby that the sale of intoxicating liquors therein should be prohibited. From that time down to the present time many elections in the various counties and subdivisions thereof have been held and such elections carried. So that now much more than half of all of the counties have prohibition in force therein. In a great many other counties various subdivisions thereof have so voted and thereby have determined that such sales shall be prohibited therein. In fact, with probably the exception of only a very few counties, prohibition is in force in all the counties of this State, or some subdivisions of all of them where not in the whole. People of this State, and of the various counties and subdivisions thereof, have all the time experienced much trouble in enforcing these laws and in preventing illegal sales of intoxicating liquors in the prohibition counties and subdivisions thereof. Wherever prohibition has thus been put into effect there have been a greater or less number of persons who have defied such laws, and persistently, designedly and in-

tentionally, by craft and cunning, devised schemes and means to defeat the enforcement thereof, sometimes through apparent forms of law, and at others without any form of law. In one way or another they have evaded and circumvented the law, and, to a more or less degree, rendered its enforcement very difficult, and by their many schemes and devices they continue to violate it and make illegal sales. The people of this State have known these lamentable facts all this time. The legislators and Legislatures have known it, and as these lawless, designing and scheming persons have from time to time so manipulated as to evade and circumvent these various laws, the Legislature has passed many others to meet such emergencies, so that the will of the people and of the Legislature against this lawless element shall be carried out and the laws enforced. One of these schemes by the lawless element has been to have shipped, from points outside of the prohibition territory, to them in prohibition territory, frequent shipments, and various quantities of intoxicating liquors, claiming in every instance that they were not having it shipped to them and receiving it for the purpose of making illegal sales thereof, but for their own personal use and the use of their families. The records of this court, in many cases, show that this has been frequently done and is to some extent being done all over the State; and such persons, when prosecuted for either making individual sales thereof, or for engaging in the business of making such sales, have unhesitatingly sworn, on their trials, denying making such sales, and denying engaging in such business, and swearing that the quantities of liquor shipped to and received by them, however great or frequent, were for their own personal use and the use of their families,—notwithstanding the evidence by others in their cases has shown, and the juries have so found, that their testimony is false, and that they received such liquors not for their personal use, or for the use of their families, but for the purpose of making unlawful sales thereof and unlawfully engaging in such business. These shipments and deliveries to them have been over the various common carriers and express companies from points both within and without this State.

With such knowledge and under such circumstances our Legislature has, as stated, from time to time, passed such legislation and all such legislation, which was believed would, and intended to prevent such lawlessness, and effectively prohibit such illegal sales; and, as said by this court in Fitch v. State, 58 Texas Crim. Rep., 366: "It would be a monstrous doctrine to hold that the Legislature is powerless to enact legislation defining offenses and prescribing penalties for the new conditions that may arise." Both this and our Supreme Court, wherever the question has arisen, have held that not only has the Legislature this power and authority, but it is its imperative duty to pass such legislation. Fitch v. State, supra; Slack v. State, 61 Texas Crim. Rep., 372; Dozier v. State, 62 Texas Crim. Rep., 259; Ex parte Dupree, 101 Texas, 150; Dupree v. State, 102 Texas, 455; Edmonson v. State, 64 Texas Crim. Rep., 413, 142 S. W. Rep., 887; Ex parte Townsend, 64 Texas Crim. Rep., 350, 144 S. W. Rep., 628; Ex parte Flake, 67 Texas

Crim. Rep., 216, 149 S. W. Rep., 146, and other cases cited in these. This
is so well settled by the many decisions of this and the Supreme Court,
a further discussion is wholly unnecessary.

With this knowledge, and this duty imposed upon the Legislature,
and for the purpose and for no other, than to make more effective said
prohibition laws in prohibition territory, and to detect and prevent
illegal sales of intoxicating liquors within this State, our Legislature
duly enacted said Allison Act.

Judge Harper's opinion is written on the theory that this prosecution
is based on section 5 of said Allison Act. How he can so claim is past
all comprehension. That section is:

"It shall be unlawful for any person, firm or corporation, or any
officer, agent or employe thereof, to ship, or transport in any manner
or by any means whatsoever any . . . intoxicating liquors of any
kind from a point within any other State . . . to any person, firm
or corporation, or agent, officer, or employe thereof, in this State resid-
ing or living within any territory within this State where the sale of
intoxicating liquors has been prohibited under the laws of this State,
which . . . liquor is intended by any person interested therein to
be received, possessed, sold or in any manner used, in violation of any
law of this State."

That section, as is seen, does not in any way deal with the question
of the *delivery* of liquors, either directly or indirectly. It deals exclu-
sively with the question of the *shipment* or *transportation* thereof. It
says: "It shall be unlawful for any person . . . to *ship* or *trans-
port,* any liquor,*" etc.—not that it is unlawful for any person to
*deliver* it.

If this prosecution was based on section 5, of course, it could not
stand, for there is not an intimation in this record that Peede in any
manner, shape or form, *shipped* or *transported* said liquor, nor is he in
any manner, shape or form charged therewith. Both the charge and
evidence exclude the idea that he shipped or transported it.

But he is unquestionably charged with *delivering* it, after its *ship-
ment* and *transportation* had been entirely completed,—and not until
then. Let's see what the record shows:

The complaint, which is the sole basis of the accusation, avers: That
said Peede "did then and there in Kaufman County, Texas, unlawfully
*deliver* to H. A. Laird intoxicating liquor," etc. Neither by direct lan-
guage, nor otherwise, does it aver that he shipped or transported it. No
testimony whatever was introduced that tended to show or intimate that
Peede shipped or transported the liquor. It all showed he *delivered* it.
Laird so testified. So did Peede. Rutledge, the deputy sheriff, who
made the complaint, swore he did so on information, etc., that Peede
*delivered* it; "I made the complaint upon the theory that the defendant
had no right to *deliver* a shipment of liquor, no matter to whom it came
nor where it came from." Terry, the county attorney, swore: "This
prosecution was instituted upon the theory that any *delivery* of intoxi-
cating liquor in a local option county under an interstate shipment is

unlawful." The judgment of the justice of the peace in the examining trial says he bound him over "to answer to the offense of unlawfully *delivering* intoxicating liquor." His commitment said the same thing. The judgment of the district judge was precisely to the same effect.

The first Allison Act was passed at the regular session of the Thirty-third Legislature and approved by the Governor March 31, 1913, page 125. Every section and feature of that Act by the clearest and most specific language shows that it applied exclusively to matters in this State. In fact, it says: "Nothing in this Act shall be construed as relating to interstate shipment and transportation of intoxicating liquor, or to the delivery of same to any person . . . within this State, on such interstate shipment or transportation."

At the time this Act was first introduced and was worked through both houses of the Legislature, the Webb-Kenyon bill had not been passed by the Congress, although that bill was finally passed before said Allison Act was approved. When the first called session convened July 21, 1913, of course it was then known by all men that the Webb-Kenyon bill had been passed and was in force. Then, and because thereof, the last Allison Act was introduced and passed. The Legislature intended, and did, take advantage of the Webb-Kenyon Act, by this last Act, so as not only that the Act should "relate to *intrastate* shipments, transportation and delivery of such liquors," but also clearly to "relate to *interstate* shipments, transportation and delivery" thereof.

Unquestionably section 4 of the present Allison Act takes the place, and is in lieu of section 3 of the first Act. I quote these sections side by side:

The present Act:

"Except as otherwise provided in this Act, it shall be unlawful for any person, firm or corporation, or any agent, officer or employe thereof to ship, transport, carry or deliver any intoxicating liquor to any other person, firm or corporation, or any agent, officer or employe thereof in this State."

The first Act:

"Except as otherwise provided in this Act, it shall be unlawful for any person, firm or corporation, or any officer, agent or employe thereof, to ship, transport, carry or deliver any intoxicating liquor *from any point within this State* to any other person, firm or corporation, or any officer or agent or employe thereof, within this State."

It, of course, is seen that in the present Act these quoted words in the first are omitted: "From any point within this State." These words in the first were intended and had the effect to restrict the offense exclusively to intrastate shipments, etc., occurring "within this State." They were struck out in the present Act, so as not to limit the Acts occurring exclusively to points "within this State," but without doubt so that also all acts occurring as to interstate shipments, transportation and delivery of such liquors should be included. There can be no shadow of doubt of this.

Judge Harper, in his opinion, wherein he discusses section 5 of said Allison Act, says, in effect, that in order to make it applicable to the offense charged in this case it would be "necessary for the court to strike from said section the words—he quotes them—"and this the court is not authorized to do." . . . "The court is not the law enacting agency of the government—that function is conferred upon the Legislature."

These principles he announces are absolutely true. It is also as true that this court has no authority or right to repeal or annul any constitutional law, or part of it, duly enacted by the Legislature,—"that function is conferred upon the Legislature" exclusively. No one can deny this.

And yet, if his opinion in this case prevails, this court will annul, repeal and strike from the statute book section 4 of said law.

Judge Harper quotes certain words—the last of section 5, which he says ought to have been left out, and says if that had been done by the Legislature "the language then would have needed no construction, for it would have, in clear and unequivocal terms, prohibited the interstate shipment and transportation of intoxicating liquors into prohibition territory." Even if the Legislature had done what he says to section 5, that could not possibly have affected this case, for as I have shown, Peede was not prosecuted for either shipping or transporting liquor,—but only for delivering it. However, without a shadow of doubt, the Legislature anticipated his suggestion and fully met it in section 4, for it enacted: "It shall be unlawful for any person . . . to ship, transport, carry or deliver intoxicating liquor to any other person . . . in this State," thereby using "language which needs no construction, for it, in clear, unequivocal terms prohibits the interstate shipment and transportation of such liquors, but also in like language and terms, prohibits the *delivery* thereof.

In my opinion the present Allison Act is a complete whole, entirely harmonious in its provisions and is the most effective and certain law to actually make prohibition territory dry, that has ever been enacted in this State. It may be that two members of this court, over the opinion of both the legislative and executive branches of this government, and the earnest protest of the other member, have *power* to annul, repeal and strike said law from the statute book, but surely it is done without *right* or *authority,* as I see it.

Notwithstanding my voice and pen may be raised and used in vain to sustain said law, I deem it my duty to further discuss it from my viewpoint.

From said Act and all the provisions thereof, as shown above, it is perfectly clear and certain that the Legislature intended to make it an offense, and did make it an offense, for any person to *deliver* to any other person in prohibition territory in this State, intoxicating liquors, wherever obtained,—whether in this State or some other State. It does not prohibit, and it was not intended to prohibit, any person (sec. 9) for the use of himself, or the members of his family residing with him,

to *"personally carry"* such liquor into prohibition territory, whether obtained from any point within, or without, this State. In other words, it does not prohibit, but authorizes, any person to *"personally carry"* for said purposes, at any time and all times, such liquor into such territory. But *every person* is prohibited from *delivering* it to him in prohibition territory, regardless of where it was obtained, or the use it is to be put to, or the quantity. All of this for the purpose and with the intent by the Legislature to meet a known evil whereby heretofore persons had had shipped and *delivered* to them in prohibition territory intoxicating liquors, claiming that it was for their own personal use, when, as a matter of fact, it was not, but intended and afterwards used to make illegal sales.

One question is, therefore, whether the Legislature had the power and authority to make it an offense for one person to *deliver* intoxicating liquors to another in prohibition territory when such other is authorized himself to *"personally carry,"* whenever he desires, such liquor as he wants for said purposes when obtained in and shipped from another State.

In the recent case of Purity Extract & T. Co. v. Lynch, 226 U. S., 192, 57 L. Ed., 184, it was shown that for the purpose of more effectively enforcing its law against the sale of intoxicating liquors, which was prohibited by the laws of Mississippi, the Legislature of that State passed a law prohibiting absolutely the sale of malt liquors and made it an offense to do so, when it was conclusively shown that the malt liquor, for which that prosecution and conviction was had, had no alcohol whatever in it, but was merely a harmless drink, called "poinsetta." The Supreme Court of the United States in sustaining the constitutionality of that law said:

"That the State, in the exercise of its police power, may prohibit the selling of intoxicating liquors is undoubted. Bartemeyer v. Iowa, 18 Wall., 129, 21 L. Ed., 929; Boston Beer Co. v. Massachusetts, 97 U. S., 25, 24 L. Ed., 989; Mugler v. Kansas, 123 U. S., 623, 31 L. Ed., 205, 8 Sup. Ct. Rep., 273; Kidd v. Pearson, 128 U. S., 1, 32 L. Ed., 346, 2 Inters. Com. Rep., 232, 9 Sup. Ct. Rep., 6; Crowley v. Christensen, 137 U. S., 86, 34 L. Ed., 620, 11 Sup. Ct. Rep., 13. It is also well established that when a State exerting its recognized authority, undertakes to suppress what it is free to regard as a public evil, it may adopt such measures having reasonable relation to that end as it may deem necessary in order to make its action effective. It does not follow that because a transaction, separately considered, is innocuous, it may not be included in a prohibition the scope of which is regarded as essential in the legislative judgment to accomplish a purpose within the admitted power of the government. Booth v. Illinois, 184 U. S., 425, 46 L. Ed., 623, 22 Sup. Ct. Rep., 425; Otis v. Parker, 187 U. S., 606, 47 L. Ed., 323, 23 Sup. Ct. Rep., 168; Ah Sin v. Wittman, 198 U. S., 500, 504, 49 L. Ed., 1142, 1144, 25 Sup. Ct. Rep., 756; New York ex rel. Silz v. Hesterberg, 211 U. S., 31, 53 L. Ed., 75, 29 Sup. Ct. Rep., 10;

Murphy v. California, 225 U. S., 623, 56 L. Ed., 1229, 32 Sup. Ct. Rep., 697. With the wisdom of the exercise of that judgment the court has no concern; and unless it clearly appears that the enactment has no substantial relation to a proper purpose, it can not be said that the limit of legislative power has been transcended. To hold otherwise would be to substitute judicial opinion of expediency for the will of the Legislature,—a notion foreign to our constitutional system.

"Thus, in Booth v. Illinois, 184 U. S., 425, 46 L. Ed., 623, 22 Sup. Ct. Rep., 425, the defendant was convicted under a statute of that State which made it a criminal offense to give an option to buy grain at a future time. It was contended that the statute, as interpreted by the State court, was 'not directed against gambling contracts relating to the selling or buying of grain or other commodities, but against mere options to sell or buy at a future time without any settlement between the parties upon the basis of differences, and therefore involving no element of gambling.' The argument was that it directly forbade the citizen 'from pursuing a calling which, in itself, involves no element of immorality.' This court, in sustaining the judgment of conviction, said: 'If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the State thinks that certain admitted evils can not be successfully reached unless that calling be actually prohibited, the courts can not interfere, unless looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear unmistakable infringement of rights secured by the fundamental law.' It must be assumed, it was added, that 'the Legislature was of opinion that an effectual mode to suppress gambling grain contracts was to declare illegal all options to sell or buy at a future time'; and the court could not say that the means employed were not appropriate to the end which it was competent for the State to accomplish. (Id., pp. 429, 430.)

"The same principle was applied in Otis v. Parker, 187 U. S., 606, 47 L. Ed., 323, 23 Sup. Ct. Rep., 168, which dealt with the provision of the Constitution of California that all contracts for the sale of shares of the capital stock of any corporation, on margin, or to be delivered at a future day, should be void, and that any money paid on such contracts might be recovered. The objection urged against the provision in its literal sense was that the prohibition of all sales on margin bore no reasonable relation to the evil sought to be cured; but the court upheld the law, being unwilling to declare that the deep-seated conviction on the part of the people concerned as to what was required to effect the purpose could be regarded as wholly without foundation. (Id., pp. 609, 610.)

"A strong illustration of the extent of the power of the State is found in New York ex rel. Silz v. Hesterberg, 211 U. S., 31, 53 L. Ed., 75, 29 Sup. Ct. Rep., 10. The State of New York, by its forest, fish and game law, prohibited the possession of certain game during the closed season. The statute covered game coming from without the State. It

appeared that Silz was charged with the possession of plover and grouse which had been lawfully taken abroad during the open season and had been lawfully brought into the State; that these game birds were varieties different from those known as plover and grouse in the State of New York; that, although of the same families, in form, size, color, and markings, they could readily be distinguished from the latter; and that they were wholesome and valuable articles of food. This court affirmed the conviction, saying: 'It is insisted that a method of inspection can be established which will distinguish the imported game from that of a domestic variety, and prevent confusion in its handling and selling. That such game can be distinguished from domestic game has been disclosed in the record in this case, and it may be that such inspection laws would be all that would be required for the protection of domestic game. But, subject to constitutional limitations, the Legislature of the State is authorized to pass measures for the protection of the people of the State in the exercise of the police power, and is itself the judge of the necessity or expediency of the means adopted.' It was pointed out that the prohibition in question had been found to be expedient in several States, 'owing to the possibility that dealers in game may sell birds of the domestic kind under the claim that they were taken in another State or country.'

"It was competent for the Legislature of Mississippi to recognize the difficulties besetting the administration of laws aimed at the prevention of traffic in intoxicants. It prohibited, among other things, the sale of 'malt liquors.' In thus dealing with a class of beverages which, in general, are regarded as intoxicating, it was not bound to resort to a discrimination with respect to ingredients and processes of manufacture which, in the endeavor to eliminate innocuous beverages from the condemnation, would facilitate subterfuges and frauds and fetter the enforcement of the law. A contrary conclusion, logically pressed, would save the nominal power while preventing its effective exercise. The statute establishes its own category. The question in this court is whether the Legislature had power to establish it. The existence of this power, as the authorities we have cited abundantly demonstrate, is not to be denied simply because some innocent articles or transactions may be found within the proscribed class. The inquiry must be whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat.

"That the opinion is extensively held that a general prohibition of the sale of malt liquors, whether intoxicating or not, is a necessary means to the suppression of trade in intoxicants, sufficiently appears from the legislation of other States and the decision of the courts in its construction. State v. O'Connell, 99 Me., 61, 58 Atl., 59; State v. Jenkins, 64 N. H., 375, 10 Atl., 699; State v. York, 74 N. H., 125, 127, 65 Atl., 685, 13 Ann. Cas., 116; State ex rel. Guilbert v. Kauffman, 68 Ohio St., 635, 67 N. E., 1062; Luther v. State, 83 Neb., 455, 20 L. R. A. (N. S.), 1146, 120 N. W., 125; Pennell v. State, 141

Wis., 35, 123 N. W., 115.  We can not say that there is no basis for this widespread conviction.

"The State, within the limits we have stated, must decide upon the measures that are needful for the protection of its people, and, having regard to the artifices which are used to promote the sale of intoxicants under the guise of innocent beverages, it would constitute an unwarrantable departure from accepted principles to hold that the prohibition of the sale of all malt liquors, including the beverage in question, was beyond its reserved power."

The still more recent case of Patsone v. Penn., decided by the United States Supreme Court, in 232 U. S., 138, reported in the issue of February 15, 1914, of the Law. Co-op. U. S. Supreme Court advance opinions, reiterated and emphasized precisely the same doctrine. In that case the validity of an Act of the Legislature of Pennsylvania of May 8, 1909, was attacked as unconstitutional, which Act made it an offense for any resident foreign born person to own or be possessed of a shotgun or rifle in that State and a forfeiture of the gun, too.  The object of the Legislature in enacting such law was to protect the wild game in that State.  In that case the United States Supreme Court said:

"Under the Fourteenth Amendment the objection is twofold; unjustifiably depriving the alien of property, and discrimination against such aliens as a class.  But the former really depends upon the latter, since it hardly can be disputed that if the lawful object, the protection of wild life (Geer v. Connecticut, 161 U. S., 519, 40 L. Ed., 793, 16 Sup. Ct. Rep., 600), warrants the discrimination, the means adopted for making it effective also might be adopted.  The possession of rifles and shotguns is not necessary for other purposes not within the statute.  It is so peculiarly appropriated to the forbidden use that if such a use may be denied to this class, the possession of the instruments desired chiefly for that end also may be.  The prohibition does not extend to weapons such as pistols that may be supposed to be needed occasionally for self-defense.  So far, the case is within the principle of Lawton v. Steele, 152 U. S., 133, 38 L. Ed., 385, 14 Sup. Ct. Rep., 499.  See further, New York ex rel. Silz v. Hesterberg, 211 U. S., 31, 53 L. Ed., 75, 29 Sup. Ct. Rep., 10; Purity Extract & Tonico Co. v. Lynch, 226 U. S., 192, 57 L. Ed., 184, 33 Sup. Ct. Rep., 44.

"The discrimination undoubtedly presents a more difficult question.  But we start with the general consideration that a State may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out.  A lack of abstract symmetry does not matter.  The question is a practical one, dependent upon experience.  The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class.  It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named.  Lindsley

v. National Carbonic Gas Co., 220 U. S., 61, 80, 81, 55 L. Ed., 369, 378, 379, 31 Sup. Ct. Rep., 337, Ann. Cas., 1912, C., 160. The State 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses.' Central Lumber Co. v. South Dakota, 226 U. S., 157, 160, 57 L. Ed., 164, 169, 33 Sup. Ct. Rep., 66; Rosenthal v. New York, 226 U. S., 260, 270, 57 L. Ed., 212, 216, 33 Sup. Ct. Rep., 27; L'Hote v. New Orleans, 177 U. S., 587, 44 L. Ed., 899, 20 Sup. Ct. Rep., 788. See further Louisville & Nashville R. R. Co. v. Melton, 218 U. S., 36, 54 L. Ed., 921, 47 L. R. A. (N. S.), 84, 30 Sup. Ct. Rep., 676. The question therefore narrows itself to whether this court can say that the Legislature of Pennsylvania was not warranted in assuming as its premise for the law that resident unnaturalized aliens were the peculiar source of the evil that it desired to prevent. Barrett v. Indiana, 229 U. S., 26, 29, 57 L. Ed., 1050, 1052, 33 Sup. Ct. Rep., 692.

"Obviously the question, so stated, is one of local experience, on which this court ought to be very slow to declare that the State Legislature was wrong in its facts. Adams v. Milwaukee, 228 U. S., 572, 583, 57 L. Ed., 971, 977, 33 Sup. Ct. Rep., 610. If we might trust popular speech in some States it was right; but it is enough that this court has no such knowledge of local conditions as to be able to say that it was manifestly wrong. See Trageser v. Gray, 73 Md., 250, 9 L. R. A., 780, 25 Am. St. Rep., 587, 20 Atl., 905; Com. v. Hana, 195 Mass., 262, 11 L. R. A. (N. S.), 799, 122 Am. St. Rep., 251, 81 N. E., 149, 11 Ann. Cas., 514."

The case of Lawton v. Steele, 152 U. S., 133, cited in the two cases of the United States court just above quoted from, was an attack on the constitutionality of the law of the State of New York, making it an offense to catch fish otherwise than by rod and line, and another Act not only making it an offense, but forfeiting as against the owner, any net or other means or device for taking fish. In other words, the Act was for the protection of the fish.

The case of New York ex rel. Silz v. Hesterberg, 211 U. S., 31, likewise cited in the two cases from the United States Supreme Court, just above quoted from; and the said case of Patsone v. Penn., supra, were for the protection of the wild fowls in the States of New York and Pennsylvania.

We are taught in Holy Scripture, in estimating the value of the body and soul,—a human being,—that two sparrows were sold for a farthing, and yet, not one of them should fall to the ground without the notice of our Heavenly Father. And again, that five sparrows were sold for two farthings, and not one of them was forgotten before God. In the cases from the United States Supreme Court, cited above, the States of New York and Pennsylvania were protecting their fish and wild fowls. In this State our Legislature is undertaking to protect its citizens,— its men, women and children,—from the awful effects of the unlawful sale and use of intoxicating liquors as a beverage, which the United States Supreme Court, and every other court in this land, says the

injury to the person drinking it to excess "first falls upon him in his health, which the habit undermines; in his morals, which it weakens; and in the self-abasement, which it creates. It leads to neglect of business and waste of property and general demoralization. It affects those who are immediately connected with and dependent upon him." Surely, if another State can protect its wild fowls from the gun, and its fish from the net, Texas can protect its men, women and children from the awful curse and fearful effects of the illegal sale of intoxicating liquors.

The Legislatures, and not the courts, "must decide upon the measures that are needful for the protection of its people, for with the wisdom of the exercise of that judgment the court has no concern. To hold otherwise would be to substitute judicial opinion of expedience for the will of the Legislature,—a notion foreign to our constitutional system." Purity Extract & T. Co. v. Lynch, supra.

As shown above, "*there can be no doubt* that the *regulation* of the manufacture, sale, and use of intoxicating liquors *has always been recognized* as a subject peculiarly appertaining to the police power of the several States respectively." This is not only clearly established by the cases cited above, and many others from the United States Supreme Court, but it is so established by the decision of every State in this Union, which has passed on the question, and every text-book writer who has treated the subject, without any exception.

Soon after the Wilson Act, hereinafter quoted, was enacted by the Congress,—and which Act is still in full force,—it was contended before the United States Supreme Court, in Vance v. Vandercook Co., 170 U. S., 438 (42 L. Ed., 1140), that a law of the State of South Carolina was contrary to the commerce clause of the United States Constitution, and void as unconstitutional, because that Act did not authorize or permit any State to pass any law to *regulate* the sale of such liquors, when shipped from another State, but authorized and permitted the State only to absolutely and altogether *prohibit* the sale; and as the law of said State did not so *prohibit* but *regulated* only, said State Act was void. But the United States Supreme Court held the reverse of said contention, holding:

"Congress, it is argued, by the Act in question (Wilson Act) has submitted merchandise in original packages only to the control of State laws 'enacted in the exercise of its police powers.' As the State law here in question does not forbid, but, on the contrary, authorizes, the sale of intoxicants within the State, hence it is not a police law, therefore not enacted in the exercise of the police power of the State, and consequently does not operate upon the sale of original packages within the State. But the premise upon which these arguments rest is purely arbitrary and imaginary. *From the fact that the State law permits the sale of liquor subject to particular restrictions and only upon enumerated conditions, it does not follow that the law is not a manifestation of the police power of the State. The plain purpose of the Act of Congress having been to allow State regulations to operate upon the*

*sale of original packages of intoxicants coming from other States, it would destroy its obvious meaning to construe it as permitting the State laws to attach to and control the sale only in case the States absolutely forbade sales of liquor, and not to apply in case the States determined to restrict or regulate the same.*

"The confusion of thought which is involved in the proposition to which we have just referred is embodied in the principle upon which the court below (80 Fed. Rep., 791) mainly rested its conclusion. That is, 'if all alcoholic liquors, by whomsoever held, are declared contraband, they cease to belong to commerce, and are within the jurisdiction of the police power. But so long as their manufacture, purchase, or sale, or their use as a beverage in any form or by any person, are recognized, they belong to commerce, and are without the domain of the police power.' But this restricts the police power to the mere right to *forbid,* and denies any and all authority to *regulate or restrict.* The manifest purpose of the Act of Congress was to subject original packages to *the regulations and restraints imposed by the State law.* If the purpose of the Act had been to allow the State law to govern the sale of the original package only where the sales of all liquor were forbidden, this object could have found ready expression, whilst, on the contrary, the entire context of the Act manifests the purpose of Congress to give to the respective States full legislative authority, both for the purpose of *prohibition* as well as for that of *regulation and restriction* with reference to the sale in original packages of intoxicating liquors brought in from other States." (Italics added.)

The same contention was again made before said court in Reymann Brewing Co. v. Brister, 179 U. S., 445, as to an Act of the State of Ohio, wherein said court again held the reverse of said contention, holding:

"As this statute subjects intoxicating liquors imported into a State to the operation and effect of the laws of such State only when enacted in the exercise of its police powers, it is contended that such is not the character of the Dow law; that, as it contains no prohibition upon the manufacture or sale of intoxicating liquors, and only purports to *regulate* the trafficking therein, it is not a police measure.

"As we have heretofore stated, the Supreme Court of Ohio has construed the law to aim at controlling and regulating sales in quantities less than one gallon in saloons or at places other than the place of manufacture, and to be, therefore, within the scope of the police power. We think that this view of the meaning and intent of the statute is consistent with its language, and, even if not bound by the construction put upon the statute by the State court when applying the provisions of the Wilson law, we do not hesitate to adopt it.

"A similar contention was disposed of by this court in the case of Vance v. W. A. Vandercook Co., 170 U. S., 438, 42 L. Ed., 1104, 18 Sup. Ct. Rep., 674, and where it was said: 'From the fact that the State law permits the sale of liquor, subject to particular restrictions, and only upon enumerated conditions, it does not follow that the law is not a manifestation of the police power of the State. The plain

purpose of the Act of Congress having been to allow State regulations to operate upon the sale of original packages of intoxicants coming from other States, it would destroy its obvious meaning to construe it as permitting the State laws to attach to and control the sale only in case the States *absolutely forbade* sales of liquor, and not apply in case the States determined to *restrict or regulate* the same.'" (Italics added.)

Again, the same contention was made before the Ohio Supreme Court in Stevens v. State, 61 Ohio St., 597, on p. 605 (56 N. E., 478). That court held to the contrary, saying:

"Notwithstanding the plain power here conferred (Wilson Act) on the States in the exercise of the police power to regulate the traffic in intoxicating liquors, irrespective of whether the traffic be interstate or domestic, it is contended that to be a police regulation within the above statute of the United States, the prohibition of the sale of intoxicating liquors must be absolute; and because as claimed, the local option law permits the sale of cider, and wine manufactured from the pure juice of grape, it is not a proper exercise of the police power within the Act of Congress. There is nothing in the language of the statute that gives countenance to such construction. It makes all intoxicating liquors, transported into any State for sale or consumption, subject to the operation and effect of all laws of such State enacted in the exercise of its police powers. There is no purpose manifested here as to what shall be the character of these laws, other than that they shall be of a police nature; and any law that regulates the traffic is of a police nature, and within the above statute, unless it should discriminate against the products of other States.

"The contention is being based upon a misconception of some things said in Scott v. Donald, 165 U. S., 58, at p. 100. That it is a misconception is clearly pointed out by Justice White in the subsequent case of Vance v. Vandercook, 170 U. S., 438, 446. This having been pointed out, it is then said: 'From the fact that the State law permits the sale of liquor subject to particular restrictions and only on enumerated conditions, it does not follow that the law is not a manifestation of the police power of the State. The plain purpose of the Act of Congress having been to allow State regulations to operate upon the sale of original packages of intoxicants coming from another State, it would destroy the obvious meaning to construe it as permitting the State laws to attach and control the sale only in case the State absolutely forbade sales of liquor, and not to apply in case the State determined to restrict or regulate the same.' The local option law, section 2, prohibits the sale of all intoxicating liquors as a beverage, or the keeping of a place therefor in all townships availing themselves of its provisions. It, however, permits the manufacture and sale of cider, and the sale of wine manufactured from the pure juice of the grape, cultivated in this State, but prohibits the keeping of a place where wine and cider are sold as a beverage. It also permits the sale by a registered druggist of pure wines or liquors for mechanical, medicinal or sacramental pur-

poses. The law seems sufficiently drastic,' and, if enforced, must conduce to the peace, good order and sobriety of a township; and is therefore in every sense a police regulation."

No court has ever held as contended for above. It could just as plausibly and with equal force be argued that because the Allison Act very properly and reasonably permits druggists, hospitals, educational, etc., institutions, manufacturers under certain circumstances, and priests and ministers for sacramental purposes, to have liquor shipped and delivered to them in prohibition territory, the Act is invalid and void, and the Webb-Kenyon Act inapplicable to interstate shipments, as to argue that because the Act permits a person for his own use and that of his family, to get and personally carry such liquor into such territory, renders the Act invalid, and the Webb-Kenyon Act inapplicable. If such fallacious contention should prevail, then every State would be under the necessity of absolutely prohibiting the manufacture, sale and use of liquor for every purpose under the sun, and it could not in any possible way regulate the matter.

Said Webb-Kenyon Act is: "An Act divesting intoxicating liquors of their interstate character in certain cases.

"The shipment or transportation in any manner or by any means whatsoever of any . . . intoxicating liquor . . . from one State . . . into any other State . . . which . . . is intended by any person interested therein to be *received, possessed,* sold or *in any manner used* either in the original package, or otherwise, in violation of such law of such State . . . is hereby prohibited."

Now what is it the law of this State—the Allison Act—makes unlawful for a person to do? Unquestionably to *deliver* intoxicating liquor in prohibition territory to *any other person,* regardless of where the liquor was obtained, whether in this or some other State.

It must be kept in mind that Laird, the buyer, is not prosecuted for *receiving,* but instead, Peede is prosecuted for *delivering* the liquor. The Allison law does not specifically make it *an offense* for any person to *receive* liquor in prohibition territory, whether *received* for a lawful or an unlawful purpose. But it does clearly make it *an offense* for any person to *deliver* liquor to any other person in such territory, whether *delivered* for a supposed lawful or an unlawful use or purpose. (The exceptions of druggists, etc., in other sections have no application.) However, because the law does not make it *an offense* to *receive* liquor in prohibition territory, it by no means follows that it is not *unlawful* to *deliver* it, or even *receive* it, therein. The Webb-Kenyon Act makes many things *unlawful,* without making any of them *an offense,* or punishing therefor. So of the Allison Act; it making it unlawful and an offense, too, for any person to *deliver* liquor to another in prohibition territory, it thereby is not lawful, but must be unlawful, for such other to *receive* it; although it does not make it an *offense to receive,* nor *punish* the *receiving* person.

Our law makes it unlawful and an offense under certain circumstances for a person to *sell* liquor in prohibition territory. It does not,

though it might, make it an offense to *buy* it in such territory. But the law making it *an offense* to *sell,* it would not therefore be lawful, but *unlawful,* to *buy* although the *buyer* is not punishable.

Neither by section 9 of the Allison Act, nor by any other section thereof, nor by the whole Act, was it intended or meant that it should be lawful for a person to get liquor into prohibition territory for his own personal use or that of his family, in any and every way he might choose. On the contrary, it was intended and meant that he could get it in *one way only,*—by himself personally going after and getting it, and himself *"personally carrying"* it therein. This section 9 is a *regulation* of *how,* and prescribes the *only way,* a person can lawfully get liquor into prohibition territory for his own use or that of his family. He can not lawfully have it *delivered* to him by any other person for that purpose. Any *delivering* to him by any other person, even for that purpose would, without doubt, be unlawful. His *receipt* of it, therefore, from any person, though not a specific offense, nor punishable, is undoubtedly unlawful. *No one can lawfully receive from another what is made unlawful for the other to deliver to him.* Campbell v. Jones, 2 Texas Civ. App., 263, 21 S. W. Rep., 723; Hunt v. Robinson, 1 Texas, 748; Shelton v. Marshall, 16 Texas, 344; Logan v. Norris, 100 Texas, 228; Miller v. Ammon, 145 U. S., 421, 36 L. Ed., 759; Armstrong v. Toler, 11 Wheat., 258, 6 L. Ed., 468; Hanauer v. Doane, 12 Wall., 342, 20 L. Ed., 439. It is useless to collate and cite the other decisions of this State and the United States and the decisions of the various other States and text-books to the same effect.

Now the Webb-Kenyon Act does not say, mean or imply that the State law which is violated or to be violated, shall prescribe some penal offense and punishment therefor as such, but just so such liquor is intended by the person interested therein to be *received, possessed,* sold, or *in any manner used,* unlawfully. In other words, the tenor, intention and meaning of the Congress by the whole Webb-Kenyon Act, unquestionably was to entirely remove the protection as interstate commerce from intoxicating liquor, so that each State, by the laws thereof, could have full application thereto and thereabout, both to prohibit and to regulate.

Evidently section 9 was placed in the Allison Act, and kept there, when an attempt was made to strike it therefrom, for obvious reasons. Some of these were,—there may have been others,—

The legislators may have been in doubt whether a law could constitutionally prohibit absolutely a person in prohibition territory from himself getting and personally carrying liquor for his own use and that of his family therein. The Supreme Courts of many States have held such prohibition void as unconstitutional. The courts of this State have never passed on the question. The Legislature doubtless did not want to imperil the bill on this constitutional question. Besides, it was sought to strike out this section by the enemies of the bill—not its friends,—which made its friends more cautious.

Again, some of the older voters, although prohibitionists, occasionally

want a little liquor as it is said, "for the stomach's sake"; and they don't want to entirely and absolutely cut themselves off from getting it, when they can go after, get and themselves "personally carry" it to their homes for their own use and that of their families.  The enemies of the bill, of course, knew this and they sought to make the law so obnoxious that such voters would not vote for prohibition; or, if it was already in force, they would vote to do away with prohibition in their territory.  The friends of the bill wanted to avoid this.

Again, as forcibly stated by the Supreme Court of Delaware in State v. Grier, 88 Atl., 579, hereinafter more fully quoted, in order to make the existing prohibition law more effective and assist in carrying out the will of the people in voting for prohibition, the Legislature regulated how a person, for his own use and that of his family, could lawfully get liquor into prohibition territory.  "Manifestly the Legislature believed that more good could be accomplished, and the existing laws would be more effective, if the importation was not entirely prohibited. . . . They evidently thought it would be better to permit the individual" to himself get and "personally carry" it therein. . . . "The controlling thought and intention was not that no liquor at all should be had in such territory, for 'there was a fear in the mind of the Legislature that if the law was made so rigid as to prevent the individual from securing liquor in any way and in any quantity,' for his own use and that of his family the 'effect would be that the existing law would become so unpopular as to be incapable of enforcement.' "

But whatever the reason, the Legislature only, and not this court, had the power and authority to determine whether or not such regulation should be a part of said law.

By putting and keeping said section in said Act the Legislature, by no construction, could have intended to turn every person in prohibition territory loose, so that he could order and have shipped and delivered to him for his own use and that of his family liquor by the bottle, case, barrel or carload by any and every person and means he chose.  On the contrary, it intended, as it says, that he, *himself*, for said purposes, could "personally carry" such liquor into such territory, but could lawfully get it therein in no other way.

It is a general principle of law that whatever a person can himself do, he can also do by another.  The Legislature unquestionably can change this rule and require the person himself to do the act, and prohibit any other from doing it for him.  Such law would be perfectly valid.  Our laws furnish many examples of this.  Thus, before the Allison Act, any person in prohibition territory could legally order liquor shipped and have it delivered by the express or other carrier to him therein.  But the law expressly required him to receive and receipt for it *in person,* and punished the carrier's agent if he delivered it to any other than the owner *in person.*  (P. C., art. 606.)  The Congress has also enacted substantially such law, Act of March 4, 1909, Crim. Act.  Again our law in certain circumstances requires the voter to pay his poll tax and get his receipt or exemption *in person.*  Under other

circumstances it permits him to authorize in writing another to pay this tax for him.   But in either event it prohibits the tax collector from delivering the receipt or exemption to any other than the voter *in person*, and makes it an offense, and punishes him, if he does so.   (R. S., 2944-5-5a, P. C., 238.)   The fact that the voter can pay the tax by an agent, and that it is his privilege, if not his duty, to pay the tax, by no means would it logically, or otherwise, follow, that the law could not make it illegal for the tax collector to deliver the receipt or exemption to any other than the voter *in person*.   There can be no doubt of the validity of such legislation.   Neither can there be any doubt of the validity of the Allison Act where it prohibits any person from delivering such liquor to another in prohibition territory, and makes it an offense to do so, even though such person is authorized himself for his own use and that of his family to get liquor anywhere outside of prohibition territory, and to himself, "personally carry," it into such territory.   His personally getting and "personally carrying" it into such territory is quite a different and distinct thing from having some other person *deliver* it to him in such territory.

In American Express Co. v. Beer, 65 So. Rep., 575, the Supreme Court of Mississippi, in a very able opinion, tersely expresses what was intended by the Webb-Kenyon Act, saying:

"The Webb-Kenyon Act, and a comparison of its language with that of the Wilson Act, will demonstrate that its draftsman intended to cure the defect in the Wilson Act and to make it unlawful to transport into a State from without intoxicating liquors *intended by any person interested therein to be dealt with contrary to the laws of the State;* in other words, to divest such intoxicating liquor altogether of its interstate character, and thereby permit the laws of the State into which it was being transported to operate upon it immediately upon its crossing the State line—from which it follows that the State may prescribe not only *the use to which liquor is to be put, but the quantity that, and the manner in which it may be received."*   (Italics added.)

A statute of Kentucky made it an offense for any person or corporation to bring intoxicating liquor into, or deliver such liquor into any prohibition territory of said State from any wet territory thereof, but expressly authorized any person, for his private use, to bring *upon his person,* or as his *personal baggage,* such liquor not to exceed one gallon. The express company corporation in wet territory received from the shipper a box containing bottles of whisky, and shipped and delivered it to the consignee into dry territory—all within said State.   The quantity was not shown though probably only one gallon or less.   It was not brought into said dry territory by the consignee upon *his person* nor as his *personal baggage,* though doubtless intended for his private use.   The express company in that case, Adams Express Co. v. Commonwealth, 112 S. W. Rep., 577, was convicted, and the Supreme Court affirmed the conviction, among other things, saying:

"The State and Federal governments have done much to foster commerce, and the public policy has been upheld.   But the statute in ques-

tion here is not for the benefit of commerce. It rests upon a different conception. The Legislature is aiming to protect men, women and children from the vices of an article of commerce, which is deemed by the Legislature an evil, and in doing so they have attempted to put a check upon a vehicle of commerce. The legislation is anti-commercial. It puts the peace and good order of society above its commerce in this particular. In construing and applying the statute, if the courts devitalize it by subordinating it to the supposed interests of commerce, the manifest legislative intent would be frustrated, which is contrary to every allowable rule of statutory construction. . . . Let them be as careful to obey the law as they are to further their own interests and there will be little doubt but that the law will be obeyed."

The United States Supreme Court in L. & N. Ry. Co. v. Cook Brewing Co., 223 U. S., 70, 56 L. Ed., 355, expressly recognized the validity of said Kentucky law as applicable to intrastate shipments of liquor, saying: "Valid as the Kentucky legislation undoubtedly was as a *regulation* in respect to intrastate shipments of such articles" . . . and further: "The obligation of the railroad company to conform to the requirements of the Kentucky law, so far as that law prohibited intrastate shipments, is clear, and to this extent its circular notification was commendable."

The State of Idaho passed a law making it an offense for any person to ship intoxicating liquor to any person in prohibition territory, in that State, or deliver such liquor to anyone therein, wherever obtained. Zimmerman & Co. sued to compel by mandamus the Oregon-Washington R. R. Co. to receive from them at Portland, Oregon, a gallon of whisky and ship and deliver it to Charles Holsten at Heyburn, Idaho, for his personal use. Heyburn was in prohibition territory in Idaho. The United States court in Oregon, in U. S. ex rel. Zimmerman & Co. v. Ore.-Wash. R. & N. Co., 210 Fed. Rep., 378, refused to mandamus, holding said Idaho law was valid, that the Webb-Kenyon Act was also valid, and under it the railroad could lawfully refuse to receive an interstate shipment of liquor for the personal use of the consignee, intended to be delivered into prohibition territory in another State, the laws of which prohibited its delivery therein.

The laws of Mississippi made it an offense for any person to ship and deliver intoxicating liquor from any other State to any person in the prohibition territory of Mississippi, but expressly authorized a person to order, have shipped and delivered to him in such territory not exceeding one gallon for his own use or that of his family. The law also prohibited the delivery to him of even the one gallon and made it an offense to do so, unless he would first make affidavit that it was for his own use, etc., and that he would not use it in violation of law. In said case of Amer. Exp. Co. v. Beer, supra, Beer contended said law was void under the commerce United States constitutional clause, and was not authorized by the Webb-Kenyon Act, on both said phases: First, that the State could not limit the delivery of the quantity of liquor for personal use (in that instance it was three gallons) ; and, second, it

could not require the party to make said affidavit as a condition precedent to its delivery to him as it was for his personal use,—the law not forbidding anyone to so use liquor. The court in that case held adversely to each of said contentions,—that the law could, and did limit the quantity to one gallon, and prohibit the delivery even of the one gallon, unless the consignee made said affidavit, although it was for his own personal use.

The Supreme Court of Delaware, through Chief Justice Pennewill, in State v. Grier, 88 Atl. Rep., 579, has delivered a very able and exhaustive opinion in which a law of Delaware, and said Webb-Kenyon Act were attacked for unconstitutionality on almost, if not every, point that could be raised. The opinion fully sustains both laws.

The Delaware law was enacted after the Webb-Kenyon Act was passed, and made it an offense for any common carrier to receive for shipment to or deliver, intoxicating liquor to any person or place where prohibition was in force in said State; and also for any person or his agent, engaged in the manufacture or sale of such liquor, to carry, bring or convey the same into such territory.

But it expressly excepted shipments and deliveries to physicians and druggists in unbroken packages not to exceed five gallons, and to churches of wine in such packages, for sacramental purposes.

It also expressly authorized anyone to carry, bring, or have brought such liquor from any point in said State into such territory not to exceed one gallon in twenty-four hours, or as otherwise expressed, made it unlawful for anyone to carry, etc., more than one gallon within said time.

Tony Kayser was a liquor dealer in Philadelphia, Pennsylvania. Grier was his agent. Prohibition was in force in Sussex County, Delaware. Conaway, who lived in Sussex County, ordered two quarts of whisky from Kayser and paid him $2 therefor. Conaway intended to use the whisky for his own consumption, and not to sell or otherwise dispose of it. Kayser sent the whisky from Philadelphia into said Sussex County, Delaware, by his agent, Grier, who carried it from Philadelphia into, and delivered it, to Conaway in Sussex County. Grier was convicted for bringing the whisky into Sussex County and delivering it to Conaway.

The court in that case showed that prior to said last law, prohibition, in force in said Sussex County, forbade the sale and manufacture of intoxicating liquor, but did not prevent the shipment or bringing liquor therein in any quantity or by any means. Our law prior to the Allison Act, did not prohibit such shipment or delivery. The court then said:

"In order to make the existing laws more effective, and assist in carrying out the expressed will of the people, the Legislature undertook, by the Act under consideration, to regulate the importation of liquors into this local option territory. Manifestly the Legislature believed that more good would be accomplished, and the existing laws would be more effective, if the importation was not entirely prohibited. .          .
They evidently thought it would be better to permit the individual to

bring into the local option territory a small quantity of liquor in any one day. But this privilege or exemption was restricted to the individual himself, and denied to liquor dealers and common carriers. The purpose is obvious, and the discrimination, the State contends, was entirely proper under the circumstances. The controlling thought and purpose was, that no liquor should be sold in Kent or Sussex Counties, but there was a fear in the mind of the Legislature that if the law was made so rigid as to prevent the individual from securing liquor in any way or in any quantity, the effect would be that the existing law would become so unpopular as to be incapable of enforcement. Therefore the bringing in of small quantities by individuals was made permissible. . . . . To that extent the statute is clearly and purely regulatory. . . .

"The Legislature did not attempt to prevent or prohibit entirely the bringing of liquors into local option territory, but rather to regulate it by providing by whom and in what quantities it should be brought. Such was undoubtedly the legislative scheme and intent. . . . The purpose being that only individuals, physicians, druggists and churches should have the right to bring in liquors, it was necessary in the fulfillment of the legislative scheme that the Act should clearly designate those who should not have the right. It was therefore provided . . . that common carriers and liquor dealers should not have such right."

The opinion then proceeds to completely demonstrate that the Legislature had the right to prohibit liquor dealers and common carriers from carrying and delivering liquor in such territory, although it permitted others to ship and receive, and a party himself to carry, etc., one gallon therein for his own use, and that said State law was valid and covered by said Webb-Kenyon Act, which also was constitutional. All these cases support and sustain my views.

The Fourteenth Amendment to the United States Constitution in no way prevents any State from regulating or prohibiting the handling, use or sale, etc., of intoxicating liquor in any way the State desires best for the protection of its people. 1 Woolen & Thorn. Intox. Liq., secs. 108-109. This is so well settled it is unnecessary to discuss it, or cite other authorities.

Appellant contends that the Allison law does not apply to interstate shipments. I am unable to comprehend how such contention can be seriously made when the very face of the statute is to the contrary. Said Act,—the Allison law,—in its very first section states that it amends chapter 67 of the Acts of the Thirty-third Legislature, which was approved March 31, 1913, page 125. This original Act by the several sections thereof shows that it was intended to apply, and did apply, to the shipment, delivery, etc., of intoxicating liquors to and from points wholly within this State. And by section 4 thereof it expressly provided that it should not be construed as relating to interstate shipments, etc. After the original Act was passed, what is known as the Webb-Kenyon law of March 1, 1913, 37 Stat., 699, was passed by Congress. This occurred prior to the enactment of the Act of August

21, 1913, the present Allison law.  One of the main objects in amending the original was to expressly take out those provisions in the first Act which restricted it to intrastate matters alone, and the new Act throughout, in all of its provisions, distinctly and expressly shows that it was intended to apply and does apply to interstate as well as intrastate matters as I have shown above.

Appellant also contends that said Webb-Kenyon law does not authorize said Allison law to apply to an interstate transaction, nor give the Texas courts jurisdiction over the carrier or its agent in the transportation or delivery of intoxicating liquors, but if it does, then said Webb-Kenyon law is unconstitutional.

No court other than that of the Supreme Court of the United States could authoritatively determine the question of whether or not the said Webb-Kenyon law is unconstitutional.  While this is true, as the question is raised in this case, and it is necessary to be decided by this court in order to determine this case, the question must necessarily be passed upon.  As I view the law and the rules, I would not be authorized to declare said Act unconstitutional, unless it was so clearly and indisputably so that there could be no reasonable doubt thereof.  In other words, if there was a reasonable doubt of its constitutionality it would be my duty to solve that doubt in favor of its constitutionality.  However, I entertain no doubt of its constitutionality.

The Constitution of the United States, article 1, section 8, is: "The Congress shall have power:  .  .  .  3.  To regulate commerce  .  .  . among the several States.  .  .  ." As I understand, without citing them, the decisions of the Supreme Court of the United States, before the Wilson Act was passed, established and settled that under this provision of the Constitution, the shipment of any article of commerce originating in one State, was protected and held to be an article of interstate shipment from the time and place of its original shipment, not only to the delivery thereof to the consignee in another State, but until the sale thereof in the original package by the consignee, and that no State law could attach thereto, nor the owner be affected thereby, until *after the sale* of such article in the original package by the consignee.  At once after this doctrine was held and settled by the decisions of the United States Supreme Court as to intoxicating liquors (Leisy v. Hardin, 135 U. S., 100) in order to avoid the effect thereof Congress passed the Act approved August 8, 1890, known as and called the Wilson Act.  By which Congress removed intoxicating liquors as an article of interstate commerce, shipped from one State into another, upon its *arrival,* in the other State, and permitted the laws of the arrival State to take effect thereabout as the laws of that State did to other intoxicating liquors which was not an interstate shipment, and the court held that that Act of Congress so removing the article from interstate commerce was constitutional.  (In re Rahrer, 140 U. S., 545.)  Later, in 1897, the question arose as to the proper construction of the Wilson Act as to when intoxicating liquors *arrived* in the delivery State. so that the State laws could apply thereto.  The judges of the

Supreme Court of the United States differed as to this, the majority, however, holding in Rhodes v. Iowa, 170 U. S., 412, and other cases, that by the Wilson Act what was meant by the *arrival* of an interstate shipment of intoxicating liquors, was the *delivery* thereof to the consignee, and not when it crossed the State line in the arrival State, so that the protection as an interstate shipment was only cut off after delivery to the consignee and before its sale in the original package. And such has been the construction of said Wilson Act up to the time of the passage of the Webb-Kenyon law. This construction caused the enactment of the Webb-Kenyon law.

By the first section of the Act of Congress of March 2, 1895, chapter 195, it was made an offense for any express company, a common carrier, to carry lottery tickets from one State to another. The constitutionality of that Act was attacked, claiming that under the said constitutional provision authorizing Congress to *regulate* commerce, Congress did not have the power to *prohibit* an article of commerce from being so shipped. In what are called the Lottery Cases (188 U. S., 321), the Supreme Court of the United States expressly held that a lottery ticket was an article of commerce, but that Congress under said provision had the right and power to prohibit the interstate shipment thereof, and completely sustained the constitutionality of said Act of Congress. The principles announced in the Lottery Cases have been adhered to by the United States Supreme Court ever since.

Then we have completely established:

1. Originally, before Congress acted, as held by the United States Supreme Court, intoxicating liquor shipped from one State into another was an interstate shipment like any article of legitimate merchandise, and protected from the laws of the State wherein received, until the consignee thereof not only *received,* but also *sold, it in the original package.*

2. As soon as this doctrine was established by the decisions of the United States Supreme Court, Congress acted and passed the Wilson Act declaring "that all . . . intoxicating liquors transported into any State . . . or remaining therein for use, consumption, sale or storage therein, shall, upon arrival in such State, . . . be subject to the operation and effect of the laws of such State . . . enacted in the exercise of the police powers to the same extent and in the same manner as though such liquors had been produced in such State . . . and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." 26 Stat., 313. That statute has expressly been held constitutional by the United States Supreme Court. The effect of this Act, expressly so held by the United States Supreme Court (In re Rahrer, 140 U. S., 545; Rhody v. Iowa, 170 U. S., 412, and other cases) was to make intoxicating liquors subject to the laws of the States as soon as it *arrived* in the State.

3. That later the question arose as to when such interstate shipment of intoxicating liquors *arrived,*—whether as soon as it crossed the State

line or not until it was delivered to the consignee thereof beyond the State line. The United States Supreme Court held that such interstate shipment of intoxicating liquors by the terms of the Wilson Act had not *arrived* until it was actually *received* by the consignee thereof at its destination within the receiving State, even beyond the State line; thereby holding that the said Act was intended and made intoxicating liquor cease to be an interstate shipment, not at the State line, but upon its actual *delivery* to the consignee, but before a sale thereof by him in the original package.

4. Before this the Supreme Court of the United States established by its decisions that the Congress under its constitutional power to *regulate* interstate commerce, had the power and authority to *prohibit* an article of commerce,—lottery tickets—from being shipped from one State into another. Clearly intoxicating liquors could and should be classed in the same category as lottery tickets, or worse.

5. Because the United States Supreme Court held under the Wilson Act Congress meant that intoxicating liquor did not *arrive* when the shipment crossed the State line, it passed the Webb-Kenyon law, which clearly prohibits and makes illegal, the shipment of intoxicating liquor from one State into another whenever such liquor is to be *received, possessed,* sold, *or in any manner used,* in another State, when by the laws of such State in which delivered, such *receipt, possession or use in any manner* is a violation of the laws thereof. Thereby clearly making such liquor subject to the laws of the receiving State as soon as it crosses the State line.

6. But if it could, or should, be held, that the Congress does not have the power and authority to *prohibit* the interstate shipment and *delivery,* etc., of intoxicating liquor into a prohibition State, contrary to the laws of such State, then certainly the Webb-Kenyon law must be held to be a proper *regulation* of interstate commerce, and perfectly valid. The government of the United States was instituted for the *benefit* of the several States, and not as *hostile* to them, or any of them. Nor to strike down any law of the several States enacted for the good of its people under their unquestioned police power. Instead of the United States government being hostile to any or all of the States, it was instituted for the benefit and as an aid to each and all of them.

7. The Allison law, without question, in my opinion, makes it an offense for any person to *deliver* to any other person in prohibition territory in this State, intoxicating liquors whether shipped from any point without or within this State.

8. In my opinion, the appellant, Peede, in the County of Kaufman, where the prohibition law of this State was in force, knowingly *delivered* to Laird in said county, intoxicating liquors which had been shipped from a point in Arkansas to Kaufman, in Kaufman County, Texas, which is made an offense under the laws of this State, and he is, therefore, guilty, and should be held and not discharged.

There is nothing in appellant's contention that the Allison law is

unconstitutional because it is class legislation. This court has expressly held said Act constitutional. Ex parte Muse, 168 S. W. Rep., 520.

I have been unable to find where any State Supreme Court has held said Webb-Kenyon Act unconstitutional. On the contrary, the Supreme Courts of several States have expressly held it constitutional in very able, clear, forcible. and exhaustive opinions. I refer to State ·v. Greer, 88 Atl. (Del.), 579; State v. U. S. Exp. Co., 145 N. W. (Iowa), 451; State v. Doe, 139 Pac. (Ks.), 1169; Amer. Exp. Co. v. Beer, 65 So. (Miss.), 575, and the Chief Justice, in a concurring opinion in State v. Cardwell, 81 S. E. (N. C.), 628, and the Federal Judge, Bean, in U. S., etc., v. Ore.-Wash. R. R. Co., 210 Fed. Rep., 378, expressly so hold. The Supreme Court of Alabama in effect so held in So. Express Co..v. State, 66 So.; 115.

I can not close this already too lengthy opinion without expressing my appreciation of the very able briefs by Hons. S. J. Osborne and W. Dorsey Brown for Mr. Peede, and of Hons. W. A. Keeling and C. M. Cureton, Assistants Attorney General, on behalf of the State, and the great aid I have received therefrom.

ON REHEARING.

November 18, 1914.

HARPER, JUDGE.—The State has filed a lengthy and exhaustive motion for rehearing herein, but after carefully considering same our opinion in the premises is not changed.

. We do not think section 4 of the Allison Act has any application to interstate shipments of intoxicating liquors, but that the Legislature in dealing with interstate shipments chose its language deliberately in accordance with the language of the Webb-Kenyon law, and meant for section 5 to apply exclusively to interstate shipments, and we think this is manifest by the plain provisions of the law. But had our Legislature intended otherwise, and by any possible construction the provisions of section 4 could be made to apply to interstate shipments, every court of last resort before which the interstate shipments of intoxicating liquors has come, has held that a State is powerless to prohibit interstate shipments of liquor for personal use. One of the most recent . cases is a decision of the Supreme Court of Delaware, Van Winkle v. State, 91 Atl. Rep., 385, decided in June of this year, in which it clearly shows that those who contended that that court .ad held in Ex parte Grier that a State could prohibit shipments for personal use were mistaken—that the question involved in this case was not involved in the Grier case, which fact is manifest to anyone who will read the opinion— they held Grier had made an illegal sale, and the question of shipment was not involved except for an unlawful purpose. As the Delaware Supreme Court in the Van Winkle case reviews the history of this character of legislation, and disposes of every question raised by the State in the motion for rehearing, we adopt that portion of the opinion relating to the questions involved in this case. It says:

"Propositions 4, 5, and 6 are as follows:

" 'That beer, being an intoxicating liquor, is an article of commerce, and in this case is a lawful article of interstate commerce, and as such can not be subject to State law as to its transportation, and delivery as a part of such transportation, in Kent County.

" 'That the Federal law of March 1, 1913, known as the "Webb-Kenyon Law," entitled "An Act divesting intoxicating liquors of their interstate character in certain cases," does not deprive the shipment in question of the protection of the interstate commerce law, in that the shipment in question was intended to be used for a lawful purpose.

" 'That if the said Federal statute, known as the "Webb-Kenyon Law," is applicable by its terms to the case charged in the indictment in this case, yet that the said Federal statute is unconstitutional.'

"These propositions are nearly related in principle and present in different phases the same questions of law, and will therefore be considered together. They involve questions of the validity of a State law regulating or attempting to regulate and restrict commerce between the States in a specified commodity, and the validity of a Federal law delegating, permitting or acquiescing in the exercise of such a power by a State, in view of the provision of the Federal Constitution conferring upon the Congress of the United States supreme power to regulate commerce between the States, and thus prevent in new forms old questions which have been the basis of legislative and judicial conflicts between the State and Federal governments almost since their foundation.

"In our scheme of government, which contemplates the delegation of certain and defined powers to national control and the reservation of equally certain powers to State or local control, there is with respect to the existence and location of those powers no conflict between State and Federal sovereignties. But in a complicated system such as ours, wherein exists two governments over the same people, in which in different ways the laws first of one and then the other are supreme, according to the authority under which they are enacted, and with reference to the subjects to which they are addressed, conflicts in the exercise of those powers are inevitable.

"Among the powers reserved to each of the separate governments which, together form the general government of the United States, is what is termed 'police power' of the State. This power is an attribute of sovereignty, and when exercised within its scope is supreme, to the exclusion of the power of the general government. Police power 'is the power of government inherent in every sovereignty, that is to say, the power to govern men and things' (License Cases, 5 How., 504, 583, 12 L. Ed., 256), and when exercised by a State sovereignty extends to such restraints and regulations as are reasonable and proper to protect the lives, health, comfort and property of its citizens and to promote the order, morals, safety, and welfare of society.

"On the other hand, among the powers delegated to the Federal government is the power to regulate commerce between the States, and in

the exercise of that power the authority of the Federal government is supreme to the exclusion of the powers of State government.

"When between these extremes of sovereignty there comes a thing, which from its nature as property is a subject of ownership, traffic and interstate commerce and over it the Federal government assumes supreme control, and which because of its nature is a menace to the health, morals and safety of society, and over it the State likewise attempts supreme control, there occurs a collision of powers, and from that collision one only can emerge supreme.

"In such a conflict it devolves upon the court to determine which sovereignty has been invaded and which power is supreme. To arrive at such a determination it is necessary for the courts to revert to the early laws, examine and ascertain the powers originally partitioned between the government of the States and the United States, and seek the foundation of the laws out of which such a controversy has arisen, by progressively following the legislative and judicial history of the matter down to the point of conflict. This is not merely a wise policy but it is a necessary one, as the only guides to a decision of a case like this are those afforded first by the language of the Constitution, and then the legal meaning of that language, and the legal effect of the statute enacted thereunder, as determined and illuminated by the judicial pronouncements upon the subject by the judicial tribunal having authority finally to decide the law. A decision by the court in this case that involves anything beyond this would be a decision without authority, for by the decisions of the Supreme Court of the United States, respecting the powers delegated to the general government and those reserved to the State government, are we not only guided but controlled, and until those decisions are modified or altered, or the language of the Constitution itself is changed, they constitute the supreme law, and we are bound by them.

"The conflict between the State and Federal governments for control and regulation of the sale and transportation of liquor has been waged since early times, and revolves around what is known as the commerce clause of the Federal Constitution (art. —, sec. 8), and the meaning and legal effect of that clause as a supreme Federal power, taken in connection with or in opposition to the police powers of the States, which, when existing and defined, are in turn supreme in the States.

"The Constitution declares that the Congress has power 'to regulate commerce with foreign nations, among the several States, and with the Indian tribes.' These words give all the authority which the United States has over commerce. The police powers of the States are not conferred by statute, but are powers reserved to the States for the regulation of their internal affairs, and are rather elastic in their scope and definition.

"The power to regulate commerce among the several States is granted to the Congress in the same clause and by the same words as the power to regulate commerce with foreign nations, and is co-extensive with it.

The first judicial pronouncement by the Supreme Court of the United States upon the commerce clause of the Constitution, which has a bearing upon the matter now before us, was in the celebrated case of Brown v. State of Maryland, 12 Wheat., 419, 6 L. Ed., 678, and related to the right of the State of Maryland to levy a tax upon a commodity (not liquor) imported into that State from a foreign country. The question of the right of a State to enact a law that either in purpose or effect, directly or indirectly, regulates or restricts commerce with a foreign country, was fully presented to the Supreme Court for the first time by that case. The court held that an article authorized by a law of Congress to be imported continued to be a part of the foreign commerce of the country while it remained in the hands of the importer for sale in the original bale, package, or vessel in which it was imported; that the authority given to import necessarily carried with it the right to sell the imported article in the form and shape in which it was imported, and that no State, either by direct assessment or by requiring a license from the importer before he was permitted to sell, could impose any burden upon him or the property imported beyond what the law of Congress had itself imposed; but that when the original package was broken up for use or for retail by the importer, and also when the commodity had passed from his hands into the hands of a purchaser, it ceased to be an import, or a part of foreign commerce and became subject to the laws of the State, and might be taxed for State purposes, and the sale regulated by the State, like any other property. This was substantially the decision in the case of Brown v. State of Maryland, drawing the line between foreign commerce which is subject to the regulation by the Congress to the exclusion of the State, and internal or domestic commerce within each State, the regulation of which belongs to the State, to the exclusion of Congress.

"The case of Brown v. State of Maryland forms the basis of the subsequent decisions of the Supreme Court upon the matter of Federal regulation of commerce between the States with respect to the commodity of liquor. The first important cases before the Supreme Court of the United States which bore directly upon the subject were several cases thereafter known by the general name of the License Cases, 5 How., 504-633, 12 L. Ed., 256, heard and decided in 1847. In these cases the abstract question of law was: Is a State law, prohibiting the retail of imported spirits, except by license, on the ground that, for moral, medical, economical, or other reasons, the public good will not be promoted by such sale, repugnant to the Acts of Congress, and to treaties authorizing the importation of such spirits?

"On the part of those attacking the right of a State to regulate the retail of liquor authorized by the laws of Congress to be imported into the State and thereby ultimately to prohibit the resale thereof, it was contended that a congressional Act authorizing importation of spirits is a legislative determination that the foreign article may properly, and shall, enter into consumption of the State, and be sold in the interior market thereof; and that a State statute, limiting or restricting the

resale, amounts to an interception in the hands of the first buyer, shuts the importer from the country as really as if he were prohibited to import, and therefore contravenes the determination of the Federal legislation upon a directly opposite policy.

"On the other hand, the State contended that the requirement that a purchaser of imported spirits be licensed under a State law, before resale, is a regulation of the internal commerce of the State, having for its object the preservation of order, morals and health and intended to discourage intemperance and to promote sobriety, and therefore falls with the class of laws, enacted under the powers reserved to the State, and generally called 'police regulations.'

"The court held that a State could not by statute prohibit the importation of foreign spirits, as such a law would be repugnant to the commercial power of the Federal government, but the matter of the resale by the consignee of imported spirits in the original package, was one over which the Congress and the States had concurrent jurisdiction, to the extent that in the absence of regulation by Act of Congress, under the power conferred by the commerce clause of the Constitution, a State within its police power might regulate and thereby prohibit the sale of spirits in the original package in which they were imported, or in the presence of some regulating Act of Congress, a State might in turn regulate such a sale under a State law, if such State law was not inconsistent with or repugnant to the Act of Congress.

"The law as decided by the License Cases in 1847 was little disturbed by judicial decisions until the decade of 1880-1890, in which period the case of Mugler v. Kansas, 123 U. S., 623, 8 Sup. Ct. Rep., 273, 31 L. Ed., 205, was heard. In that case the Supreme Court held valid a statute of the State of Kansas, which prohibited the manufacture and sale of intoxicating liquors within the limits of that State, except for medical, scientific or mechanical purposes, but expressly avoided an opinion upon the power of a State to prohibit the sale of imported liquor within its limits, when such liquor was authorized by Congress to be imported, intimating, against the decision in the License Cases, that when the liquor is authorized to be imported from one State to another, the right of sale of the liquor would seem to follow the right to import it. The decision in this case has a relation to the matter under discussion only because it was an early expression of doubt by the Supreme Court of the right of a State to regulate or prohibit the resale of liquor after the importation, as decided in the License Cases.

"The point in the judgment of the License Cases was strictly confined to the right of the States to regulate or prohibit the sale of intoxicating liquor by the consignee after it has been brought within State limits. The right to transport liquor into the States was not questioned in those cases. Indeed, the reasoning which justified the right of a State to prohibit sales of imported liquor, admitted by implication, the right to transport liquor from one State into another as a commodity of lawful commerce, free from the control of the several States and subject to the exclusive power of Congress over commerce.

"The case of Bowman v. Chicago, etc., Ry. Co., 125 U. S., 465, 8 Sup. Ct. Rep., 689, 1062, 31 L. Ed., 700, decided in 1888, represents the next important step in the progress of judicial interpretations of State and Federal powers over commerce that is interstate in character. This case involved the validity of a law of the State of Iowa, which prohibited the *importation* of liquor into Iowa from another State by common carriers, excepting under certain circumstances.

"With respect to the right of a State to act upon matters of commerce in the absence of action by the Federal Congress, the decision in this case did not go quite to the extent of the decisions in the License Cases, but held that the right of a State to regulate commerce by a State law, in the absence of a law of Congress upon the same subject, is a right to be determined from circumstances of each case as it arises; deciding that the statute of Iowa forbidding common carriers to transport intoxicating liquors into that State from another State, excepting under certain conditions, although adopted without a purpose of affecting interstate commerce, and while intended as a part of a general system designed to protect the health and morals of the people against the evils resulting from the unrestricted manufacture and sale of intoxicating liquors within the State, was neither an inspection law nor a quarantine law, nor a law confined to the regulation of purely internal and domestic commerce of the State, over which a State may properly exercise control, but was essentially a regulation of commerce among the States, affecting interstate commerce in an essential and vital part, and not being sanctioned by the authority of Congress, either expressed or implied, was repugnant to the Constitution of the United States; and concluding with a quaere as to the main point decided in the License Cases and questioned in Mugler v. Kansas, namely, whether the right of transportation of an article of commerce from one State to another includes by necessary implication the right of the consignee to sell it in the unbroken package at the place where the transportation ends.

"The question adverted to and not decided in the opinions in the Supreme Court in Mugler v. Kansas and Bowman v. Chicago, etc., Railway Co., supra, whether a State may withhold, from a consignee of imported liquor, the right to sell the same in the original package, as an essential and constituent part of commerce in that article, was presented to the Supreme Court for a decision in the case of Leisy v. Hardin, 135 U. S., 100, 10 Sup. Ct. Rep., 681, 34 L. Ed., 128, decided April 28, 1890.

"The court cited numerous decisions made by it in recognition of the undoubted right of the States to control their purely internal affairs, under the exercise of powers not surrendered to the national government; but held that wherever the law of a State amounts essentially to a regulation of commerce among the States, by prohibiting commerce with other States in an article recognized by the laws of Congress as a subject of interstate commerce, before the article has ceased to be an article of commerce between one State and another, it comes in conflict with a power which, in this particular, has been exclusively vested

in the general government, and is therefore void. Fully admitting the police powers of the State, the court expressed itself to the effect that to extend the police power of a State over the subjects of commerce, nationwide in character, not purely local and of minor concern, like dams, harbor and pilot regulations, bridges over navigable rivers, piers, docks, etc., would make commerce subordinate to that power and would enable a State to bring within its police power any article of consumption that a State might wish to exclude, whether it belonged to that which was drunk, or to food which was eaten, or to clothing which was worn; that while a State under its police powers may by law resist and prevent the introduction of disease, pestilence or pauperism from abroad, yet disease, pestilence and pauperism are not subjects of commerce, although sometimes among its attendant evils. They are not things to be regulated and trafficked in, but to be prevented, and as long as liquors are the subject of ownership and property and therefore the lawful subjects of exchange, barter and traffic, not made by law unlike any other commodity in which a right of property and a right to traffic exists, then importation can not be prevented by a State law; and as sale thereof by the consignee in the destination State is a constituent of commerce itself, the sale can not be prevented by a State under claim of its control over the commodity under its police power. The court reviewed the position taken in the License Cases with respect to the *silence* of Congress, and in opposition thereto held, as it had previously held in the Bowman case, that:

" 'The absence of any law of Congress on the subject is equivalent to its declaration that commerce in that matter shall be free. Thus the absence of regulations as to interstate commerce with reference to any particular subject is taken as a declaration that the importation of that article into the States shall be unrestricted.'

"The court overruled the decision in Pierce v. New Hampshire (License Cases), 5 How., 504, 12 L. Ed., 256, and held that liquor is a legitimate article of commerce, that an interstate commercial transaction in liquor is not complete upon delivery to the consignee, but extends to and includes the subject sale thereof by the consignee, and that, even when Congress is silent upon the subject, a statute of a State, prohibiting the sale of imported liquor by the consignee in an interstate transaction, where the sale is made in the unbroken original package, is unconstitutional and void, as repugnant to the commerce clause to the Constitution, granting to Congress alone the power to regulate commerce among the States.

"In this and in the preceding cases of the same decisional trend were vigorous dissenting opinions delivered in maintenance of the principle that the regulation of the sale and traffic in liquor is within the police power of a State, even to the prevention of sale after arrival and to the exclusion of liquor by importation.

"The decision in the Leisy case, extending to an interstate commercial transaction in liquor the right of sale in the original package by the consignee in the destination State, regardless of the laws of such

State prohibiting such sale, was rendered April 28, 1890, and there was immediately introduced in Congress to meet that decision and to annul its force, which was enacted into law on August 8, 1890, and is known as the 'Wilson Law.'

"The Wilson Act provides: 'That all fermented, distilled or other intoxicating liquors or liquids transported into any State or territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise.' Act of Aug. 8, 1890, c. 728, 26 Stat., 313 (U. S. Comp. St., 1901, p. 3177).

"It thus appears that the police power which the Supreme Court in the License Cases conceded to the States, in regulation or preventing a resale by consignee of an imported article in the original package, was denied to the States by the Supreme Court in the Leisy case, and that the right thus first conceded, and then denied, was determined by the Wilson law. The point of decision in the two named cases and the matter contemplated as the subject of the Wilson law, as finally defined, was restricted to the right of a State to regulate or prevent a *resale* of liquor upon delivery, and did not extend to the right of a State to regulate or prohibit the *importation* of liquor, the law upon the latter point remaining as decided in Bowman v. Chicago Railway Co., supra.

"Upon the enactment of the Wilson law two questions immediately arose: First, the constitutionality of the law in depriving the consignee of liquor in an interstate transaction of his theretofore recognized right to sell the liquor in the original package in the destination State, as an ingredient or constituent element of commerce; and, second, if constitutional, when and at what point in the interstate transaction did liquor lose its interstate characteristic, and become 'subject to the operation and effect of the laws' of the destination State, under the terms of the statute that 'liquors transported into any State . . . *shall upon arrival* in such State be subject to the operation and effect of the laws of such State.'

"These questions and such others as were related to them had been considered and decided by the Supreme Court in a number of cases, to the leading ones of which reference will be made, showing the law as it stood from the date of the enactment of the Wilson law in 1890 to the year 1913.

"By these decisions the sovereign powers of the States and of the United States over matters exclusively their own were again defined and asserted. In re Rahrer, 140 U. S., 545, 11 Sup. Ct. Rep., 865, 35 L. Ed., 572, the court said:

"'(a) The power of the State to impose restraints and burdens upon persons and property, in conservation, and promotion of the public health, good order and prosperity, is a power originally and always be-

longing to the States, nor surrendered by them to the general government nor directly restrained by the Constitution of the United States, and essentially exclusive.

" '(b)   The power of Congress to regulate commerce among the several States, when the subjects of that power are national in their nature, is also exclusive.   The Constitution does not provide that interstate commerce shall be free, but by the grant of this exclusive power to regulate it, it was left free except as Congress might impose restraint. Therefore, it has been determined that the failure of Congress to exercise this exclusive power in any case is an expression of its will that the subject shall be free from restrictions or impositions upon it by the several States.   Robbins v. Shelby Taxing District, 120 U. S., 489 (7 Sup. Ct. Rep., 592, 30 L. Ed., 694).   And if a law passed by a State in the exercise of its acknowledged powers comes into conflict with that will, the Congress and the State can not occupy the position of equally opposing sovereignties, because the Constitution declares its supremacy and that of the laws passed in pursuance thereof. Gibbons v. Ogden, 9 Wheat., 1, 210 (6 Law Ed., 23).   That which is not supreme must yield to that which is supreme.   Brown v. Maryland, 12 Wheat., 419, 448 (6 L. Ed., 678).

" '(c)   That Congress can neither delegate its own powers to a State nor enlarge the powers that belong to a State.'

"Recognizing these as firmly established principles, susceptible of dispute only in their application to the given facts of a case or to the precise terms of a statute, it was decided:

" '(1)   That the right to have and use intoxicating liquor for personal purposes is denied no one by either State or Federal laws.

" '(2)   That intoxicating liquors constitute a legitimate subject of interstate commerce.   Vance v. Vandercook Co., 170 U. S., 438, 444, 18 Sup. Ct. Rep., 674, 42 L. Ed., 1100; L. & N. R. R. Co. v. Cook Brewing Co., 223 U. S., 70, 32 Sup. Ct. Rep., 189, 56 L. Ed., 355.

" '(3)   That liquor, as a designated subject of interstate commerce, may be governed by a regulation which divests it of that character, when that regulation is promulgated by a law of the Federal government, prescribing one common rule, the uniformity of which is not affected or disturbed by variations in State laws dealing with the same subject. In re Rahrer, 140 U. S., 545, 461, 11 Sup. Ct. Rep., 865, 35 L. Ed., 572.

" '(4)   That the right of a consignee to sell imported merchandise in the original package is not a right conferred or protected by the Constitution.   In re Rahrer, 140 U. S., 545, 11 Sup. Ct. Rep., 865, 35 L. Ed., 572.

" '(5)   That by the Wilson law Congress divested interstate commerce in liquor of one of its theretofore interstate characteristics, namely, the right of sale by the consignee, not by delegating the Federal power over the subject to the States, nor by permitting the commerce in the commodity to be regulated by the States, but by bringing to bear directly upon interstate commerce itself, the force of its own rule applicable to all interstate transactions in liquor without regard to local laws of

the destination States, that the interstate commercial transaction in liquor shall terminate upon the arrival of the liquor in the destination State, and with the termination of the interstate transaction terminates the Federal control, and thereafter brings the State control thereover. In re Rahrer, 140 U. S., 545, 564, 11 Sup. Ct. Rep., 865, 35 L. Ed., 572.

" '(6) That the Wilson law, in so far as its purpose or operation is to divest liquor of its interstate commercial quality upon arrival in a destination State, and to prevent resale or other disposition thereof, except under the laws of the State in which it has arrived, is a valid exercise of the power conferred upon Congress by the commerce clause of the Constitution. In re Rahrer, 140 U. S., 545, 564, 11 Sup. Ct. Rep., 865, 35 L. Ed., 572; Rhodes v. Iowa, 170 U. S., 412, 420, 18 Sup. Ct. Rep., 664, 42 L. Ed., 1088.

" '(7) That the expression of the Wilson Act, that liquor 'shall *upon arrival* in (the destination) State be subject to the operation and effect of the laws of such State,' did not mean arrival within State territory merely, but meant arrival at the point of completion of the interstate transaction, namely, in the hands of the consignee; that the Wilson law conferred no right upon a State to forbid a common carrier to transport liquor from one State into another State, or to stop at the State line an interstate shipment of liquor, or otherwise to interfere with or apply its laws to such interstate shipment until the transportation was concluded by delivery to the consignee. Rhodes v. Iowa, 170 U. S., 412, 18 Sup. Ct. Rep., 664, 42 L. Ed., 1088; Vance v. Vandercook Co., 170 U. S., 438, 18 Sup. Ct. Rep., 674, 42 L. Ed., 1100; Heymann v. Southern Ry. Co., 203 U. S., 270, 27 Sup. Ct. Rep., 104, 51 L. Ed., 178, 7 Ann. Cas., 1130; Adams Express Co. v. Kentucky, 214 U. S., 218, 29 Sup. Ct. Rep., 633, 53 L. Ed., 972; L. & N. R. R. Co. v. Cook Brewing Co., 223 U. S., 70, 32 Sup. Ct. Rep., 189, 56 L. Ed., 355.

" '(8) That a common carrier is not forbidden by the Wilson law to transport liquor from one State into another State, even when by the laws of the latter State the shipment as well as the sale of liquor is prohibited, and that, on the contrary, such shipment, when it constitutes an interstate commercial transaction, is not only protected, but may be compelled, by the commerce clause of the Constitution, notwithstanding such a shipment may be in open violation of the laws of the State into which the shipment is made, or notwithstanding the carrier might have notice that the consignee intended to sell the liquor, when received, or in some other way to dispose of it in violation of the State law. L. & N. R. R. Co. v. Cook Brewing Co., 223 U. S., 70, 32 Sup. Ct. Rep., 189, 56 L. Ed., 355; Adams Express Co. v. Commonwealth, 154 Ky., 462, 157 S. W., 908, 48 L. R. A. (N. S.), 342.

" 'Thus stood the law with respect to State and Federal control over the sale and shipment of liquor until the year 1913, when Congress enacted a statute known generally by the name of its authors as the "Webb-Kenyon Law." '

"The Webb-Kenyon bill, after its introduction, was subjected to vigorous debate and important amendment, with the result that the

popular impression of that legislation has been gathered more from the controversy that revolved about it than from knowledge of the measure itself. It is not unnatural, therefore, that the popular conception of the law is that it confers upon a State the power absolutely and totally to prohibit the importation of liquor for any purpose, while an examination of the precise terms of the law shows a very different purpose and a very different power.

"The history of contemporaneous legislation, as well as legislative debates, may in rare instances be resorted to and considered by courts in searching for the meaning of a law when the meaning is obscure, and in discovering the evils intended to be remedied when those evils are in doubt or unknown. In view of the plain language and intent of the Webb-Kenyon law, however, the court would not be justified in employing that means to aid it in reaching its conclusion, but in view of the popular misunderstanding of the law and of the purpose and extent of its provisions, entertained not by its authors and supporters in Congress, as disclosed by such of the debates as were presented to us in the briefs, but by those who have not studied and in some instances have not read the law, the court feels it to be within its province to correct this popular misconception, by adverting to the history of the legislation that surrounded the bill, and that resulted in its enactment.

"The Webb-Kenyon bill, as introduced into Congress, consisted of two sections. The first section of the bill provided, in substance, that the shipment or transportation of liquor from one State into any other, which liquor 'is intended by any person interested therein, directly or *indirectly, or in any manner connected with the transaction'* to be received, possessed, or kept, or in any manner used, in violation of any law of such State, 'enacted in the exercise of the police power of such State,' is prohibited, and any 'contracts pertaining to such transactions are declared to be null and void,' and 'no suit or action shall be maintained . . . upon any such contract, or *for the enforcement or protection* of any alleged right' based upon such contract, 'or for the *protection* in any manner whatsoever of such prohibited transaction.'

"The expression 'by any person . . . in any manner connected with the *transaction'* may have meant transaction of shipment, in which event the expression included common carriers; and the concluding expression, prohibiting the enforcement, by suit, of rights growing out of a contract and of *'protection* in any manner whatsoever of such prohibited transactions,' manifestly contemplated the protection of the commerce clause of the Constitution.

"The second section of the bill provided that any liquor transported in any State, or remaining therein for use, consumption, sale or storage, shall upon arrival *within the boundaries* of such State, and *before* delivery to the consignee, be subject to the operation and effect of the laws of such State enacted in the exercise of its reserved police powers, to the same extent and in the same manner as though such liquor had been produced in such State. H. R. 17593, 62d Congress, introduced Jan-

uary 10, 1912, Congressional Record, February 8, 10, 11, 14, 1913, p. 2919.

"The effect of the last section, which represents the popular conception of the law, would have been to overcome the decision in Bowman v. Chicago, etc., Ry. Co., and to prohibit the transportation of liquor into any State that prohibited such transportation, and stopped the shipment at the frontier, as it were, or, if it got in, then to apply to it the law which the Supreme Court in Mugler v. Kansas established as to the right of a State, under its police powers, to prohibit the sale of liquor within its borders. This is the bill and the legal effect of its provisions as it started on its passage.

"The first thing that was done was the offer and rejection of an amendment to make criminal the transportation of liquors in interstate commerce intended to be used contrary to the law of the destination State. Congressional Record, February 12, 1913, p. 3081.

"The next step was to eliminate from the bill the second section thereof. This is the section that in effect conferred upon States the right to prohibit the importation of liquor by subjecting imported liquors to the operation of State laws upon arrival at State boundary. The last step was to withdraw from the last part of the first section that part of the section avoided contracts of transportation of liquor and withheld protection for prohibited transactions, and to strike out in the middle of the section the broad language, by which common carriers might be included among those connected 'with the transaction,' leaving to be enacted into law the remainder of the first section of the bill. The law as enacted is as follows:

"'That the shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented or other intoxicating liquor of any kind, from one State, Territory or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof, into any other State, Territory or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof, or from any foreign country into any State, Territory or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof, which said spirituous, vinous, malted, fermented or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold or in any manner used, either in the original package or otherwise, in violation of any law of such State, Territory, or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof is hereby prohibited.'

"The bill in its entirety was attacked in both houses of Congress, and upon its first passage was vetoed by the President of the United States, upon the ground that it was unconstitutional and was passed over the President's veto on the 1st day of March, 1913.

"Under authority of this Act the General Assembly of the State of Delaware enacted a statute, approved by the Governor on the 8th day of the following month, entitled 'An Act regulating the shipment or carrying of spirituous, vinous or malt liquor into local option territory,

or the delivery of the same into such territory' (chapter 139, volume 27, Laws of Delaware), the provisions of which so far as they relate to the phase of the case now under consideration, are:

" 'Section 1. That it shall be unlawful for any common carrier, knowingly to accept or receive for shipment, transportation or delivery to any person or place within local option territory, or to carry, bring into, transfer to any other person, carrier or agent, handle, deliver or distribute in local option territory, any spirituous, vinous or malt liquor, regardless of the name by which it may be called. . . .

" 'Section 4. This Act shall apply to all packages of spirituous, vinous or malt liquors, whether broken or unbroken. . . .

" 'Section 6. That it shall be unlawful for any person to carry, bring or have brought any quantity of spirituous, vinous or malt liquor from any point within the State of Delaware into local option territory within said State greater than one gallon within the space of twenty-four hours.'

"In the case of L. & N. R. R. Co. v. Cook Brewing Co., 223 U. S., 70, 82, 32 Sup. Ct. Rep., 189, 56 L. Ed., 355, decided after the enactment of the Wilson law and before the enactment of the Webb-Kenyon law, Mr. Justice Lurton, in reasserting the law pertaining to the control of Congress over interstate commerce, said:

" 'By a long list of decisions beginning even prior to Liesy v. Hardin, 135 U. S., 100, 10 Sup. Ct. Rep., 681, 34 L. Ed., 128, it has been indisputably determined:

" '(a) That beer and other intoxicating liquors are recognized and legitimate subjects of interstate commerce.

" '(b) That it is not competent for any State to forbid any common carrier to transport such articles from a consignor in one State to a consignee in another.

" '(c) That until such transportation is concluded by delivery to the consignee, such commodities do not become subject to State regulation, restraining their sale or disposition.'

"Before the enactment of the Webb-Kenyon law, therefore, there was no question that the State of Delaware was without power to enact into law the provisions of the Hazel Act so far as they relate to and affect interstate commerce. After the enactment of the Webb-Kenyon law, and in the exercise of the power assumed to have been conferred upon it by that statute, the State of Delaware did what admittedly it could not have done before, and by the Hazel law prohibited commerce in liquor between other States and prohibition districts in this State, when the liquor was to be used for any purpose, other than medicinal and sacramental.

"Under this state of the law, the first question therefore is: How far and to what extent are the prohibitions of the Hazel Act authorized, aided or validated by the Webb-Kenyon law, when considered with especial reference to the offense for which the defendant below was indicted? The defendant below, acting as agent for a common carrier, completed a shipment of liquor from the State of Pennsylvania to a

prohibition district in the State of Delaware by receiving the same and delivering it to the consignee in that district. It is admitted in the case stated that the liquor 'was intended' by the consignee 'to be used by him for his own consumption,' and 'he did not intend to sell or otherwise unlawfully dispose of the same.' The Hazel Act prohibits the shipment of liquor into the prohibition district of this State for any purpose (excepting the two designated), whether the liquor be intended to be used in violation of law or not. The Webb-Kenyon law prohibits the shipment of liquor only when the liquor is intended to be used in violation of the law of the State. *There is thus presented a case of a shipment of liquor for a lawful purpose, in violation of a State statute prohibiting the shipment of liquor for any purpose, enacted under authority of a Federal statute, prohibiting the shipment of liquor for an unlawful purpose.* The first question for our determination, therefore, is whether the Webb-Kenyon law prohibits the act with which the defendant below is charged, or makes valid the prohibition of such an act by a statute. In other words, does the Webb-Kenyon law apply to this case, and, if not, is the Hazel law valid in so far as it prohibits the act committed by the defendant below? The answer to this question depends upon the meaning of the Webb-Kenyon law and the meaning given to that law by the court below constitutes the chief ground of error upon which this case is brought before us for review.

"In the division of powers under our system of government it is the function of the legislative department to make the laws and the function of the judicial department to enforce them. The courts are no more responsible for what a law may contain, so long as it is a valid enactment, than is the Legislature responsible for the manner in which the courts may enforce the law. The responsibilities of these departments are as separate as their functions.

"When a law is validly enacted and its meaning plainly expressed, the one duty of the courts with respect to it is to enforce it. It is only when, by infirmity of expression, a statute is so framed that its meaning is in doubt, that courts are required first to construe a statute in order to know how to enforce it, and in so doing the one thing they seek is the intention of the Legislature, and when they have found it, they then enforce the law which the Legislature, and not the judiciary, has made.

"In the judicial interpretation of laws, courts are guided by well recognized rules. When the language of a statute is plain and conveys a clear and definite meaning, courts give to the statute the exact meaning conveyed by the language, adding nothing thereto and taking nothing therefrom. Another meaning, that by inference or implication might otherwise be gathered from it, is avoided. When the expression is confused and the meaning obscure, then the courts seek the intention of the Legislature by the light of the fundamental rule of looking for the purpose and object of the law, searching for the mischief intended to be abated and finding the remedy intended to be afforded.

"Thus the Webb-Kenyon law means exactly what its language con-

veys, and the meaning of the law fits precisely the situation it seems intended to remedy, and but for the fact that its meaning is questioned, it would receive from us neither interpretation nor exposition. But as the Webb-Kenyon law was applied by the court below to the given facts of a case there cited, it becomes necessary on review to ascertain the meaning of the law in order to ascertain whether the law is applicable to this case.

"Undoubtedly the purpose of the Webb-Kenyon law, as finally enacted, was to enable the States more effectually to enforce their own laws in preventing and reducing the illicit sale of liquor by restricting the supply to a point that discourages infractions of the law. Of this there is no doubt, but the question is how far in effectuating this purpose does the Webb-Kenyon law go, namely, to the point of permitting a State to prohibit the importation of liquor for all purposes, or to the point of permitting a State to prohibit the importation when the liquor is intended for an unlawful purpose?

"At the outset it is conceded that, before the enactment of the Webb-Kenyon law, it was unlawful to sell liquor in certain prohibition districts in the State of Delaware; yet under the Federal law as it then stood, notwithstanding the State law, a common carrier was protected by the commerce clause of the Federal Constitution in transporting liquor into those districts, even when it had full knowledge that the liquor carried by it was intended to be used in violation of law.

"It is fair to say that the plain intent of the Webb-Kenyon law was to withdraw this protection from the carrier and thereby aid the State in enforcing its law against the illegal sale of liquor, for the carefully chosen language of the Act fits precisely this interpretation.

"So also it must be conceded that before the enactment of the Webb-Kenyon law, it was (as it still is) lawful in any part of the State of Delaware to possess and use intoxicating liquors, in the sense of having and consuming them, and a common carrier was protected in transporting liquor into those districts for that lawful purpose. If it was the purpose of the Webb-Kenyon law to meet this latter situation, change this law and withdraw this protection from the carrier, in the face of the lawfulness of the use to which the liquor was to be put, as recognized by the laws of both the State and Federal government, then such purpose must be disclosed by the law.

"The language of the law is:

" 'That the shipment or transportation (of liquor) from one State . . . into any other State . . . which said . . . liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, . . . in violation of any law of such State, . . . is hereby prohibited.'

"By this language it is apparent, first, that the thing prohibited is the shipment or transportation of liquor; second, that such shipment or transportation of liquor is prohibited (a) when the liquor so shipped is intended to be received, possessed, sold or used in violation of the

laws of a State, and (b) when that intention is entertained by any person interested in the liquor. From this analysis of the, law it is likewise apparent, first, that all shipments of liquor are not by express language prohibited; and, second, that the test of a shipment of the kind prohibited is the intent of a person, not interested in the shipment, but interested *in the liquor,* to receive, possess, sell or use the liquor in violation of the State law.

"But 'it was urged at the argument, and it was held by the court below, that the effect of the Webb-Kenyon law, was to divest liquor of its interstate character in *all* cases and to prohibit *all* shipments of liquor into a State, when by State law all shipments for all purposes are prohibited, without regard to the lawfulness or unlawfulness of the purpose to which the liquor was intended to be put, upon the theory that the interest of the carrier in a contract and act of carriage of the liquor makes it a 'person interested therein,' within the language of the Act, and being interested in the liquor it is transporting into a State against the laws of such State forbidding such transportation, it must intend by the shipment to violate the State law against shipment, and thereby does the act prohibited by the Webb-Kenyon law; in other words, 'a carrier can not ship liquor without being interested in the liquor, nor can it ship liquor without intending to ship it, and without thereby intending to violate the State law against such shipment.

"The Webb-Kenyon law by its title purports to divest liquor of its interstate character only 'in certain cases,' and the law prohibits shipment of liquor into prohibition territory only in certain cases.

"The Webb-Kenyon law makes unlawful the thing it prohibits, and conversely it is fair to say that a thing not by it prohibited is not by it made unlawful. The statute says:

" 'That the shipment or transportation' of liquor into a State, 'which said. . . . liquor (meaning when said liquor) is intended by any person interested therein, to be received, possessed, sold or in any manner used, . . . in violation of any law of such State, . . . is hereby prohibited.'

"That is what the law prohibits. Then conversely the law must mean that the shipment or transportation of liquor into a State, when said liquor is *not* intended, by any person interested therein, to be received, possessed, sold or in any manner used, in violation of any law of such State, is *not* thereby prohibited. This seems to us a necessary deduction from the language used, for if the statute does not contemplate as an exception the shipment that might be lawful, then it prohibits all shipments, and if this is what was intended, it is hard to conceive why the intention was left to be deduced and construed from the language used, when simple and direct language might have been used, prohibiting outright any shipment for any purpose, as was used in the statutes of Kentucky, Tennessee, Iowa and Delaware. Before we could hold that Congress intended or attempted to part with any of its constitutional control over interstate commerce, Congress would have to grant or permit or otherwise validly confer upon the States such control

by language that conveys a precise and unmistakable meaning to that effect, and not by language from which the meaning must be sought by argument, inference or deduction.

"It was held by the court below that if the Webb-Kenyon law did not enable a State absolutely to prohibit all shipments of liquor into its territory, when the liquor was intended for *any* purpose, the Webb-Kenyon law was but a re-enactment of the Wilson law. With this view we do not concur. By the Wilson law the *resale* by the consignee was the only thing prohibited, leaving the carrier free to transport liquor into the territory of a prohibition State, either for purposes made lawful or unlawful by the laws of such State. The Wilson law affected interstate commerce, and divested commerce in liquor of its interstate character only to the extent of subjecting it to the State law and of depriving it of its right of resale *after delivery to the consignee,* and left the carrier under the protection of the commerce clause of the Constitution for the rest of the interstate transaction. Under this protection the carrier could import liquor into a prohibition State, whether the intended use of the liquor was lawful or unlawful. In fact, under this protection a carrier could import liquor into a prohibition State, with full knowledge that upon arrival at destination and delivery to the consignee it was intended by him to be received, possessed, sold or otherwise used in violation of the laws of that State. This was the mischief intended to be remedied by the Webb-Kenyon law, as this was the state of the law after the enactment of the Wilson law and after the decision of the Supreme Court in L. & N. R. R. Co. v. Cook Brewing Co., 223 U. S., 70, 32 Sup. Ct. Rep., 189, 56 L. Ed., 355, decided January 22, 1912, and the state of the law when the Webb-Kenyon bill was introduced in Congress and finally enacted on March 1, 1913.

"To remedy this evil and to aid the States in preventing the shipment of liquor for unlawful purposes, the Webb-Kenyon law attempted a very different thing from what the Wilson law did, and by clear expression withdrew or attempted to withdraw from the carrier of liquor intended for unlawful purposes the protection it theretofore had, and afforded the States a means by which they could more effectively reach and prevent the violation of their liquor laws, when liquors were imported for the purpose of the violation of those laws. . . .

"The great volume of cases that record the controversies that for nearly a century have revolved about the commerce clause of the Federal Constitution disclose that, whatever deviation there may have been in some of its rulings, to one principle the Supreme Court of the United States has uniformly, consistently and steadfastly adhered, as a fixed and established principle of constitutional government, extending to and binding alike upon the governments of the States and of the United States, and that principle is that, under the commerce clause of the Federal Constitution, the Federal government has absolute and exclusive control over commerce between the States, that over interstate commerce the Federal government is supreme, and that any interference by State government, that amounts essentially to a regulation of com-

merce among the States, is repugnant to the Federal Constitution and is void. In the exercise of its control over interstate commerce, the Federal government, through Congress, may limit commerce between the States, which otherwise shall be free, or it may restrict it in certain features, or prohibit it altogether in certain commodities. When this is done by Congress it is valid. If attempted by a State, it is void. For these reasons it is admitted that, prior to the enactment of the Webb-Kenyon law, the State of Delaware could not have validly enacted a statute making it unlawful to ship liquor from another State into a prohibition district of this State for any purpose, such an act being beyond its own power and not being sanctioned by Congress either express or implied. But by the Webb-Kenyon Act, Congress expressed its sanction to such a law as the State of Delaware might desire to enact, prohibiting the shipment of liquor from other States into certain districts of this State when it was there to be received, possessed, sold or used in violation of the law of this State. Upon authority of this Act the State of Delaware enacted the Hazel law prohibiting with like intent the shipment of liquor from other States into prohibition districts of this State, there to be used for unlawful purposes. To this extent the Hazel law is valid, if the Webb-Kenyon law is valid. But the State of Delaware went further, and by the same law prohibited the shipment of liquor from other States into prohibition districts of this State, there to be used for purposes recognized by the Act itself to be lawful. For this much of the Hazel law the State of Delaware was without authority of its own and without the aid of the Webb-Kenyon Act, for the Webb-Kenyon Act did not prohibit, nor did it authorize the State to prohibit the importation of liquor into a prohibition territory, when the liquor was intended for a lawful purpose. The Hazel Act, therefore, in so far as it prohibits the shipment of liquor from another State into a prohibition district of this State, when the liquor is not intended to be received, possessed, sold or in any manner used in violation of the laws of this State, but is intended for a lawful purpose, is an enactment without constitutional authority, and when invoked in such cases, amounts to an interference with interstate commerce, and is therefore void.".

If section 4 of the Allison law should be held to apply to shipments of liquor from one State to another State for personal use, then the opinions of every court of last resort which have been called upon to pass on that question, would hold that section inoperative and void; but we did not at the time of writing the original opinion, and do not now think the Legislature intended that section 4 should apply to interstate shipments, but they adopted a separate and distinct section as applicable to such shipments and legalized and authorized such shipments for personal use.

The motion for rehearing is overruled.

*Overruled.*

PRENDERGAST, Presiding Judge.—In my opinion section 5 of

the Allison Act has no application whatever to this case, but section 4 thereof has exclusive application, and this prosecution was based exclusively on section 4. I think I have demonstrated this in my dissenting opinion, and also that section 4 without any doubt applies, and was intended to apply, to *deliveries* of interstate shipments.

If any "court of last resort before which the interstate shipment of intoxicating liquors has come, has held that a State is powerless to prohibit interstate shipments of intoxicating liquors for .personal use," this was .*before* the passage .of the Webb-Kenyon Act, and can have no application to such a question *since* then. The decisions of the United States Supreme Court, *before* the Webb-Kenyon Act, held that no State could prohibit the interstate shipment and delivery of such liquor, even where expressly shipped and delivered for a known unlawful purpose as well as for any lawful use or purpose, as demonstrated by the opinion of the Supreme Court of Delaware in the Van Winkle case, so fully quoted from, but no such decision has been rendered by the United States Supreme Court *since* the Webb-Kenyon Act. The decisions before are wholly inapplicable now.

The said Delaware case was rendered under a statute of that State very different from the Allison Act, and is inapplicable to this case because thereof. ·

In my very thorough search I have found no case from any other State appellate court, and I think none can be found, holding that a State can not constitutionally regulate how and when a person in dry territory can get liquor from without the State for his personal use, and that no court of any other State, with such a statute as the Allison Act, has ever so held, or ever will so hold, since the Webb-Kenyon Act was passed, and I have found no such decision so holding even before then, and I think there is no such decision.

I dissent from the opinion on rehearing and the disposition of the motion.